Chad Russell STUDEBAKER,
Petitioner,

v.

Domingo URIBE, Jr., Warden,
Respondent.

No. CV 08–2805 ODW (FMO).

United States District Court,
C.D. California.

Aug. 20, 2009.

Chad Russell Studebaker, Imperial, CA, pro se.

## ORDER ADOPTING FINDINGS, CON-CLUSIONS AND RECOMMENDA-TIONS OF UNITED STATES MAG-ISTRATE JUDGE

OTIS D. WRIGHT II, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has conducted a de novo review of the Petition, all of the records herein, and the Report and Recommendation of the United States Magistrate Judge. No objections to the Report and Recommendation have been filed. The Court approves and adopts the Magistrate Judge's Report and Recommendation. Accordingly, IT IS ORDERED THAT:

1. Judgment shall be entered dismissing the action with prejudice.

2. The Clerk shall serve copies of this Order and the Judgment herein on the parties.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

FERNANDO M. OLGUIN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Otis D. Wright II, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05–07 of the United States

District Court for the Central District of California.

## INTRODUCTION

On June 3, 2008, petitioner, a California state prisoner proceeding *pro se,* filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition") pursuant to 28 U.S.C. § 2254. On September 26, 2008, respondent[1] filed an Answer to the Petition ("Return"). On April 9, 2009, petitioner filed a Traverse to the Return ("Reply").

Having reviewed the allegations in the Petition as well as the matters set forth in the record the Return and the Reply, it is recommended that the Petition be denied and the action dismissed with prejudice.

## PRIOR PROCEEDINGS

On October 8 and 12, 2004,[2] after a jury trial in the Orange County Superior Court (Case No. 03WF2364), petitioner was convicted of: (1) attempted murder (Cal.Penal Code §§ 187(a) & 664); (2) assault with a deadly weapon (Cal.Penal Code § 245(a)(1)); (3) unlawful taking of a vehicle (Cal. Vehicle Code § 10851(a)); and (4) street terrorism (Cal.Penal Code § 186.22(a)). (Clerk's Transcript ("CT") at 318, 321–22 & 432). The jury also found that petitioner committed the attempted murder and assault with a deadly weapon for the benefit of a criminal street gang (Cal.Penal Code § 186.22(b)(1)(A)) and committed the attempted murder with a deadly or dangerous weapon and with willful premeditation and deliberation (Cal.Penal Code §§ 12022(b)(1) & 664(a)). (*Id.* at 319, 433–34 & 436). On May 13, 2005, the

trial court sentenced petitioner to an indeterminate term of 15 years to life plus a determinate term of six years and eight months in state prison. (*Id.* at 509–12).

Petitioner appealed to the California Court of Appeal. (CT at 507). In an unpublished opinion filed on January 31, 2007, 2007 WL 264301, the court of appeal affirmed the trial court's judgment. (Lodgment No. 7 ("Opinion") at 1, 2 & 23). Petitioner thereafter filed a petition for review in the California Supreme Court, which was denied on April 11, 2007, without comment or citation to authority. (Lodgment Nos. 8 & 9).

On June 29, 2007, petitioner filed a petition for writ of habeas corpus in the Orange County Superior Court, which was denied on July 31, 2007. (Lodgment Nos. 10 & 11).

On June 3, 2008, petitioner filed the instant Petition.

## SUMMARY OF FACTS

The facts underlying petitioner's conviction are not in dispute in these proceedings.[3] Accordingly, the court will quote directly from the California Court of Appeal's statement of facts in its opinion affirming petitioner's conviction.

> [Petitioner] was an active member of "Public Enemy Number One," (PEN1) a white supremacist criminal street gang with a reputation for extreme violence. One Sunday, Francisco Espinoza, an immigrant from Nicaragua, drove his wife and two very young daughters in his car displaying a Nicaraguan flag decal.

---

1. Domingo Uribe, Jr., Acting Warden of the California State Prison—Centinela, where petitioner is incarcerated, is substituted for his predecessor. *See* Fed.R.Civ.P. 25(d).

2. Because an alternate juror was substituted in during deliberations, the trial court accepted the verdicts for Counts 2, 3 and 4 on

October 8, 2004, and Count 1 on October 12, 2004. *See infra* at § V.A.

3. Petitioner adopted the court of appeal's statement of facts in his petition for review and in the instant Petition. (Lodgment No. 8 at 5); (Petition, Exh. B) (incorporating the petition for review).

Suddenly, [petitioner] emerged out of a side parking lot into the path of the Espinoza car, blocking it and forcing Espinoza to swerve quickly into the fast lane of the southbound traffic to avoid hitting [petitioner].

Espinoza regained control of his car and proceeded past the offending driver, shrugging his shoulders and lifting his palms up as if to inquire, "what is going on?" He then turned at an upcoming intersection as he originally planned. [Petitioner] suddenly sped up, went around Espinoza and cut him off as he entered the side street. Espinoza was forced to stop because [petitioner]'s car completely blocked his own. He could see [petitioner] reaching down between the seats before emerging from his car and approaching Espinoza. Fearing that his wife and daughters were in danger, Espinoza got out of his car and attempted to lead [petitioner] away. As he approached Espinoza, [petitioner] had one hand behind his thigh. Suddenly, he lunged at Espinoza, slashing the man's throat with a knife and severing a Star–of–David chain hanging there. [Petitioner] reached down, grabbed the Star–of–David and fled back to his car.

Espinoza yelled to have his wife call the police and ran after [petitioner], hoping to restrain him. As [petitioner] climbed into his car, Espinoza tried pulling him out; he broke off his efforts when [petitioner] turned and again slashed at him with the knife.[ FN3]

[ FN3] Espinoza noticed that [petitioner]'s shoes had red laces. This "fashion statement" became relevant once the gang expert testified PEN1 gang members often wore red shoelaces as a distinguishing marker.

Although getting dizzy from the loss of blood, Espinoza hurriedly returned to his car and attempted to follow [petitioner], but [petitioner] had already turned around at the end of the cul-de-sac, and was now driving directly at Espinoza's car. [Petitioner] crashed his car into Espinoza's vehicle, disabling it. But the collision also affected [petitioner]'s car, as his steering became unresponsive and he had to drive in reverse. When his car became fully dysfunctional, [petitioner] abandoned it and fled on foot.

Espinoza was bleeding extensively from his throat, and he needed immediate treatment as the gash was potentially fatal. The wound required extensive suturing, and it left a conspicuous scar and residual pain that Espinoza still suffered from at the time of trial.

Later that evening, [petitioner] visited a friend of his in Buena Park, departing in the night with the friend's mother's car. When the friend discovered he had left with her car, she phoned him and demanded he return it. He refused, keeping it for several weeks until abandoning it in the Lake Elsinore area near the home of a fellow PEN1 member. The authorities located [petitioner] in that home and arrested him, learning from him that he was en route to Mexico to avoid prosecution for the assault on Espinoza.

At trial, [petitioner] testified that Espinoza was the one who initiated the incident by cutting off [petitioner]'s car. [Petitioner] became enraged over this and only responded in the manner he did because of Espinoza's rudeness. He maintained that he never swung the knife until Espinoza attacked him in his own car, and he did so at that time to protect himself. He also denied stealing his friend's car, saying instead that she had given him permission to take it.

(Opinion at 2–4).

### PETITIONER'S CONTENTIONS

In his Petition, petitioner challenges his conviction and sentence, (Petition at 2),

and raises the following claims for federal habeas relief:

1. Petitioner was prejudiced by the trial court's failure to bifurcate the gang enhancement allegations from the other charges. (Petition at 5).

2. Petitioner's rights were violated by the admission of his prior convictions. (*Id.*).

3. The trial court abused its discretion by permitting gang expert evidence without proper foundation. (*Id.* at 6).

4. There was insufficient evidence to support the street terrorism conviction and the gang enhancement finding. (*Id.*).

5. The trial court erred by failing to give a limiting instruction regarding the gang expert's reliance on hearsay evidence. (*Id.*).

6. Petitioner was denied the effective assistance of trial counsel. (*Id.* at 6a).

7. The trial court coerced the attempted murder verdict by its remarks to the deadlocked jury. (*Id.* at 6b).

## DISCUSSION

## I. STANDARD OF REVIEW.

### A. *AEDPA.*

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214. *Woodford v. Garceau,* 538 U.S. 202, 204 & 207, 123 S.Ct. 1398, 1400 & 1402, 155 L.Ed.2d 363 (2003) (habeas application filed after AEDPA's effective date of April 24, 1996, is reviewed under AEDPA). As explained by the Supreme Court, AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). The "highly deferential standard for evaluating state-court rulings [embodied in 28 U.S.C. § 2254(d)] demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti,* 537 U.S. 19, 24, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) (*per curiam*) (internal quotation marks and citation omitted).

■ Under AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—[¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[C]learly established Federal law, as determined by the Supreme Court of the United States," within the meaning of 28 U.S.C. § 2254(d)(1), "refers to the holdings, as opposed to the dicta," of the Supreme Court's decisions as of the time of the relevant state-court decision. *Williams,* 529 U.S. at 412, 120 S.Ct. at 1523; *accord Lockyer v. Andrade (Andrade),* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003). Ninth Circuit case law "may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help ... determine what law is 'clearly established.' " *Duhaime v. Ducharme,* 200 F.3d 597, 600 (9th Cir.1999, *as amended* Jan. 10, 2000); *accord Clark v. Murphy,* 331 F.3d 1062, 1069 (9th Cir.), *cert. denied,* 540 U.S. 968, 124 S.Ct. 446, 157 L.Ed.2d 313 (2003), *overruled in part on other grounds by Andrade,* 538 U.S. 63, 123 S.Ct. 1166.

Section "2254(d) (1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, "a decision by a state court is 'contrary to' [the Supreme Court's] clearly established law if it 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Price v. Vincent*, 538 U.S. 634, 640, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003) (quoting *Williams*, 529 U.S. at 405–06, 120 S.Ct. at 1519–20); *accord Andrade*, 538 U.S. at 73, 123 S.Ct. at 1173.

■ "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of [petitioner's] case." *Williams*, 529 U.S. at 413, 120 S.Ct. at 1523; *Andrade*, 538 U.S. at 75, 123 S.Ct. at 1174. A federal court making the "unreasonable application" inquiry asks "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409, 120 S.Ct. at 1521. Although the Supreme Court has not provided a specific definition of "objectively unreasonable," it has made clear that an unreasonable application of federal law is different from an incorrect application of federal law, explaining that "[u]nder § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly." *Visciotti*, 537 U.S. at 24–25, 123 S.Ct. at 360; *accord Rice v. Collins*, 546 U.S. 333, 342, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006);

*Williams*, 529 U.S. at 411, 120 S.Ct. at 1522; *Andrade*, 538 U.S. at 75–76, 123 S.Ct. at 1175; *Edwards v. Lamarque*, 475 F.3d 1121, 1125 (9th Cir.) (*en banc*), *cert. denied*, 552 U.S. 1009, 128 S.Ct. 532, 169 L.Ed.2d 371 (2007). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Andrade*, 538 U.S. at 75, 123 S.Ct. at 1174. "Only if the evidence is 'too powerful to conclude anything but' the contrary should [the habeas court] grant relief." *Edwards*, 475 F.3d at 1126 (quoting *Miller–El v. Dretke (Miller–El 2)*, 545 U.S. 231, 265, 125 S.Ct. 2317, 2339, 162 L.Ed.2d 196 (2005)).

■ Under § 2254(d)(2), "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell (Miller–El 1)*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003). "Once the state court's fact-finding process survives this intrinsic review[,] ... the state court's findings are dressed in a presumption of correctness[ ]" and may be overturned only if new evidence presented for the first time in federal court "amounts to clear and convincing proof that the state-court finding is in error." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.), *cert. denied*, 543 U.S. 1038, 125 S.Ct. 809, 160 L.Ed.2d 605 (2004); *see also* 28 U.S.C. § 2254(e)(1); *Kesser v. Cambra*, 465 F.3d 351, 358 n. 1 (9th Cir.2006) (*en banc*) (clear and convincing proof required to rebut state court findings of fact with extrinsic evidence presented for the first time in the federal habeas court).

B. *Application of AEDPA to the Present Case.*

■ When applying AEDPA's standards of review to a claim for habeas

relief, a federal court looks to the "last reasoned decision" of a state court on that claim. *Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir.) (*en banc*), *cert. denied*, 546 U.S. 1036, 126 S.Ct. 735, 163 L.Ed.2d 578 (2005); *Forn v. Hornung*, 343 F.3d 990, 995 (9th Cir.2003, *as amended* Sept. 24, 2003). In this case, petitioner raised his claims in his direct appeal before the California Court of Appeal, which denied the claims in a written, reasoned opinion. (*See* Opinion at 4–23). Thus, in addressing petitioner's claims, the court will apply AEDPA's deferential standards of review directly to the California Court of Appeal's opinion.[4] *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir.2000), *cert. denied*, 534 U.S. 944, 122 S.Ct. 324, 151 L.Ed.2d 242 (2001).

## II. GANG EVIDENCE.

### A. *Gang Expert Testimony.*

■ In Ground Three, petitioner contends that the trial court erred in allowing the gang expert's testimony without any evidence that the offenses were gang-related. (Lodgment No. 8 at 12–13). Petitioner acknowledges that he is a member of a criminal street gang, but argues that "the fact [petitioner] is a criminal gang member, without any other indication the offense was committed for the benefit of, in association with, or at the direction of a criminal street gang and with the specific intent to promote, further, or assist in criminal conduct by gang members, does not provide a sufficient foundation to admit

an expert's opinion that an offense was committed for any of those reasons." (*Id.* at 11).

### 1. **The Court of Appeal's Opinion.**

In analyzing Ground Three, the court of appeal stated:

> [Petitioner] contends the trial court erred when it permitted Huntington Beach Police Detective John Van Holt to give his expert opinion in the form of a hypothetical question as to whether the offenses were committed for the benefit of the criminal street gang. He argues the prosecution failed to provide a factual preliminary foundation for this opinion, noting there was nothing more than the expert's opinion to indicate the crime was committed for the benefit of the white supremacist gang, PEN1. We disagree.

> [Petitioner] avers no evidence existed to establish the preliminary fact that "the offenses were committed with the specific intent to promote and benefit [PEN1]." Without such a fact, the expert's opinion on that point should have been excluded, he contends.

> Before the trial commenced, the defense admitted that PEN1 was a criminal street gang, engaged in committing the enumerated offenses proscribed by section 186.22. [Petitioner] also admitted that he was, and had been a member of PEN1. The defense then brought a motion to exclude prejudicial "profile"

---

**4.** Petitioner also raised his claims in his petition for review to the California Supreme Court, which was denied without comment or citation to authority. (*See* Lodgment Nos. 8 & 9). The California Supreme Court's "silent denial" of these claims is considered a denial on the merits of the claims contained therein. *See Hunter v. Aispuro*, 982 F.2d 344, 347–48 (9th Cir.1992), *cert. denied*, 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993). However, as the California Court of Appeal's opinion is

the last *reasoned* state-court decisions as to petitioner's claims, it is this opinion which is the focus of this court's review under AEDPA. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991) (holding that when a state court has issued a reasoned decision on a claim, federal courts are to presume that "later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground[ ]").

evidence as provided by a gang expert. In response, the court ordered the expert not to testify to " 'what a PEN1 gang member *would* do in these circumstances.' I think he can render an opinion as to what possible *range* of responses [he] would [ ] expect a gang member to have in response to that, . . ." (Italics added.) The defense motion, however, did not object to the expert testifying as to his hypothetical opinion on whether a crime, under the same facts as presented here, was committed for the benefit of PEN1.

At trial, Van Holt testified that PEN1 formed in 1986 in Long Beach as a white supremacist gang. It became the predominant white racist gang in Orange County. Certain markers became symbols of, and for the gang, such as red shoelaces, swastikas, hand signs of the letter "P," and tattoos of various violent symbols. Van Holt testified that the more violent a person was and the more crimes he would commit for the gang, the more respect he would gain within the gang. Moreover, the gang itself admitted only extremely violent people because only such persons would advance the gang's cause of instilling fear and advocating racism. Finally, Van Holt knew that [petitioner] was a member of that gang with the moniker of "Trigger," and he had seen photographs of [petitioner] in the company of other known PEN1 members and all of them were displaying the "P" hand sign. [Petitioner] also carried multiple tattoos, one of which had a hand pulling the trigger of a revolver, a swastika, and another having "Hate, Inc.[,]" which is an alternate name for PEN1. He also carried an anarchy symbol tattooed on his left arm and an eight on his right arm which was code for the eighth letter, H, an abbreviation for Heil Hitler. Finally, Van Holt had seen training tapes in which a gang member commenced an attack on a victim by concealing a knife behind his thigh—as had [petitioner]—until the assault could be completed. In Van Holt's opinion, an attack such as the one on Espinoza, was one which "would promote, further or assist [the] criminal conduct" of PEN1.[FN4]

[FN4] The prosecutor had to rephrase his question four times before the court found he had met the foundational requirements.

When the relevance of evidence depends on the existence of a preliminary fact, that fact is sufficiently shown if the evidence is strong enough to support a favorable determination by the jury of that preliminary fact. Exclusion of the dependent evidence is only permitted if the " 'showing of preliminary facts is too weak to support a favorable determination by the jury.' . . . The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion. . . ." (*People v. Lucas* (1995) 12 Cal.4th 415, 466, 48 Cal.Rptr.2d 525, 907 P.2d 373.) The sole limitation on this function is when the matter is one relevant to the ultimate issue in the case, and it is "the jury's function to determine the effect and value of [such] evidence addressed to it. . . . The judge's function on questions of this sort is merely to determine whether there is evidence sufficient to permit a jury to decide the question. . . ." (*Id.* at pp. 466–467 [48 Cal. Rptr.2d 525, 907 P.2d 373]; see also Evid.Code, § 403, subd. (a)(1).)

Therefore, the situation before us falls into this latter category as Van Holt's opinion reflected one of the ultimate issues in the case: Whether the crime benefitted or advanced the PEN1 gang. In such a situation, the evidence is to be admitted if there is evidence sufficient to permit the jury to decide the question. [Petitioner] contends, as elicited on

cross-examination of the expert, that *any* crime can only advance a gang if the gang member conspicuously announces his gang membership and gang purpose in the attack. At no time did [petitioner] ever reveal such information. Had [petitioner] attacked a rival gang member or someone who knew him and his gang status, the evidence may have been sufficient, he asserts. But Espinoza was a complete stranger to both [petitioner] and PEN1. Thus, he concludes, there was a complete dearth of evidence to support Van Holt's opinion.

"The subject matter of the culture and habits of criminal street gangs, of particular relevance here, meets [the] criterion [of being beyond common experience]." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713].) "Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' ... Such a hypothetical question must be rooted in facts shown by the evidence, however. [Citations.]" (*Id.* at p. 618 [59 Cal.Rptr.2d 356, 927 P.2d 713].)

At no time did the expert state that criminal street gangs limit their criminal activities to those in which the media is alerted and Madison Avenue publicists delineate the credit to be accorded the product or service. Van Holt's knowledge of PEN1 indicated the opposite: PEN1 gang members are extremely violent and do not require confrontations to ignite their violent responses. Their main focus is *not* to have a political or public or territorial agenda at all. That would be the province and characteristic of the "traditional skinhead gang" as distinct from the White supremacist gang such as PEN1. Quite to the contrary, the White racist gang has as its main focus "street crime" and will unexpectedly and without warning lash out violently—especially to minorities—without saying anything or identifying themselves. The purpose is to enhance their violent reputation *within their own group.* It would be consistent with PEN1 culture to strike out without warning to a *perceived* act or comment of disrespect by another whether or not that person intended to be disrespectful, such as shrugging one's shoulders while lifting his or her hands as if to say, "what's going on?" Finally, [petitioner] declared his animosity for "Mexicans, Blacks or Jews" to his girlfriend's mother. Under these circumstances, sufficient evidence existed to establish the preliminary fact necessary for Van Holt's opinion, irrespective of the lack of publicizing information that [petitioner] was a PEN1 member.

[Petitioner] concedes that a proper foundation is laid for an expert's opinion when the object of that opinion is to inform the jury as to "the animosity between gangs or *what gangs would do. if disrespected,* ... " (Italics added; cf. *People v. Gamez* (1991) 235 Cal.App.3d 957, 964–966 [286 Cal.Rptr. 894].) That latter issue is what Van Holt discussed in his expert opinion, and did quite properly, with a full foundation laid.

(Opinion at 9–12).

## 2. Applicable Federal Law.

 The United States Supreme Court has clearly limited federal courts reviewing petitions for habeas relief to claims based upon federal questions: "it is not the province of the federal habeas court to reexamine state court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire (McGuire),* 502 U.S. 62, 68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). Therefore, as

a general rule, federal courts may not review a trial court's evidentiary rulings. *Crane v. Kentucky*, 476 U.S. 683, 689, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) ("We acknowledge also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir.1999), *cert. denied*, 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 117 (2000); *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir.1998). A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it is so fundamentally unfair as to violate due process.[5] *Dillard v. Roe*, 244 F.3d 758, 766 (9th Cir.2001, *as amended* May 17, 2001), *cert. denied*, 534 U.S. 905, 122 S.Ct. 238, 151 L.Ed.2d 172 (2001); *Henry*, 197 F.3d at 1031; *Spivey v. Rocha*, 194 F.3d 971, 977 (9th Cir.1999), *cert. denied*, 531 U.S. 995, 121 S.Ct. 488, 148 L.Ed.2d 461 (2000); *see also Windham*, 163 F.3d at 1103 (The federal court's "role is limited to determining whether the admission of evidence rendered the trial so fundamentally unfair as to violate due process.").

■ "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.), *amended on other grounds by* 421 F.3d 1154 (9th Cir.2005). Put simply, admission of evidence violates due process only if there is *no* permissible inference the trier of fact can draw from it. *Id.; Houston v. Roe*, 177 F.3d 901, 910 n. 6 (9th Cir.1999),

*cert. denied*, 528 U.S. 1159, 120 S.Ct. 1168, 145 L.Ed.2d 1078 (2000); *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.1991).

■ Finally, with regard to expert testimony, the Ninth Circuit has noted that it has found no cases "support[ing] the general proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact." *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir.2009, *as amended* Jan. 30, 2009); *accord Briceno v. Scribner*, 555 F.3d 1069, 1077 (9th Cir. 2009). "Although '[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence, ... an expert may otherwise testify regarding an ultimate issue to be resolved by the trier of fact.'" *Moses*, 555 F.3d at 761 (alterations in original) (quoting *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir.1990)); *see also People v. Torres*, 33 Cal.App.4th 37, 46–47, 39 Cal.Rptr.2d 103 (1995) (While "a witness cannot express an opinion concerning the guilt or innocence of the defendant[,] ... [o]pinion testimony often goes to the ultimate issue in the case.").

### 3. Analysis.

■ Under California law, an expert may offer opinion testimony "[r]elated to a subject that is sufficiently beyond common experience that ... would assist the trier of fact[.]" Cal. Evid.Code § 801(a). "[T]he culture and habits of criminal street gangs are a proper subject for expert testimony[.]" *People v. Kille-*

---

**5.** Evidentiary errors are subject to harmless-error analysis under the *Brecht* standard: "A trial-type error of constitutional dimension is harmless unless it had a substantial and injurious effect or influence in determining the fact finder's verdict." *Gill v. Ayers*, 342 F.3d 911, 921 (9th Cir.2003) (internal quotation marks, alterations, and citation omitted); *accord Brecht v. Abrahamson*, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 1722, 123 L.Ed.2d

353 (1993); *see also Crane*, 476 U.S. at 691, 106 S.Ct. at 2147 (trial court's erroneous exclusion of exculpatory evidence central to claim of innocence is subject to harmless-error analysis); *Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir.), *cert. denied*, 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000) (holding that *Brecht* standard applies in all federal habeas cases under § 2254).

*brew,* 103 Cal.App.4th 644, 654, 126 Cal. Rptr.2d 876 (2002); *see also People v. Olguin,* 31 Cal.App.4th 1355, 1370, 37 Cal. Rptr.2d 596 (1994), *overruled on other grounds by People v. Cromer,* 24 Cal.4th 889, 103 Cal.Rptr.2d 23, 15 P.3d 243 (2001) ("The use of expert testimony in the area of gang sociology and psychology is well established."). For example, expert testimony is appropriate to demonstrate the predilection of gang members to engage in violent behavior. *People v. Gardeley,* 14 Cal.4th 605, 619, 59 Cal.Rptr.2d 356, 927 P.2d 713 (1996, *as amended* Feb. 19, 1997), *cert. denied,* 522 U.S. 854, 118 S.Ct. 148, 139 L.Ed.2d 94 (1997); *accord Garcia v. Carey,* 395 F.3d 1099, 1104 (9th Cir.2005). Gang expert testimony may also be used to provide evidence that allows the jury to make a permissible inference of the specific intent to further criminal street gang activity. *Gardeley,* 14 Cal.4th at 619, 59 Cal.Rptr.2d 356, 927 P.2d 713. Likewise, an expert is permitted to testify regarding the elements necessary to prove that a gang is a criminal street gang as defined in California Penal Code § 186.22. *Id.* at 621, 59 Cal.Rptr.2d 356, 927 P.2d 713.

During petitioner's trial, the court allowed the prosecution to introduce the testimony of Huntington Beach Police Officer John Van Holt ("Van Holt") as a gang expert. (*See* Reporter's Transcript ("RT") at 370–440). Van Holt was a nine-year veteran of the Huntington Beach and Rialto Police Departments, (*id.* at 370–71), with extensive experience dealing with gangs. (*Id.* at 371–74). After the prosecutor presented Van Holt with a hypothetical encompassing the facts of this case, (*see id.* at 397–400), he opined that the attack was conducted for the benefit of the Public Enemy Number One ("PEN1") criminal street gang: [6]

My opinion would be that it would not necessarily be at the direction of the P.E.N.I. Gang. P.E.N.I. members are allowed to free-lance. They are expected to commit crimes to help benefit gang members, but I would think without a doubt this would benefit the gang through this—the way this person hypothetically responded to a situation which could be deemed as a disrespect. There was no bargaining. There was no challenging. It was an immediate violent confrontation. I don't even want to say confrontation. An attack where this person may have deemed that this minority member, particularly after a disrespect or something coming from a minority member would be even harder to deal with.

(*Id.* at 400–01). Van Holt also opined that the conduct would promote, further or assist criminal activity:

Q ... What is your opinion?

A That conduct would promote the criminal street gang, Public Enemy Number One.

Q How is that?

A It was—it was a violent attack, a slash at the neck, minority victim, a possible perceived confrontation or disrespect by the hypothetical gang member. When a member of P.E.N.I. commits a violent assault as a response to some type of confrontation, it benefits the gang. It benefits their reputation on the street. It benefits the reputation among—or strengthens or raises the bar of fear in the community. It raises their—the bar of how they're perceived by other gangs. Violence is how they

---

**6.** Public Enemy Number One is a white racist gang located in Orange County, which is also known as "P.E.N.I.," "P.E.N.1.," "P.D.S.," "P.E.N.I. Skins" and "Hate, Incorporated." (*See* RT at 383–85).

operate. There's no doubt that it would benefit the gang.

(*Id.* at 406–07).

Petitioner asserts that Van Holt's testimony violated his constitutional rights because "the gang expert's opinions were intrinsic to the proof of intent to kill and were improperly admitted in this case without proof of the preliminary fact that the offense was gang-related." (Lodgment No. 8 at 13); (*see also* Reply at 4) ("In the Petitioner's case, the prosecution[']s 'gang expert', as a matter of the Court's discretion, was allowed to testify that no outward indica of the incident being 'gang related', was in itself proof that it was in fact gang related."). As an initial matter, to the extent petitioner contends that the admission of Van Holt's testimony impinges on the ultimate issue of whether the attack was committed for the benefit of PEN 1, (*see* Lodgment No. 8 at 11; Reply at 4), the Ninth Circuit's decision in *Moses* "forecloses such a challenge, as it holds that there is no clearly established constitutional right to be free of an expert testimony on an ultimate issue. Accordingly, the admission of the opinion testimony of [Van Holt] cannot be said to be contrary to, or an unreasonable application of, Supreme Court precedent." *Briceno*, 555 F.3d at 1078 (citation omitted).

In any event, the admission of Van Holt's testimony did not violate petitioner's due process rights. *See Briceno*, 555 F.3d at 1077 ("In any event, evidence erroneously admitted warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of the right to due process."). Van Holt's testimony was relevant to prove both motive and intent. *See People v. Funes*, 23 Cal. App.4th 1506, 1518, 28 Cal.Rptr.2d 758 (1994) ("Cases have repeatedly held that it is proper to introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or in-

tent."); *People v. Woods*, 226 Cal.App.3d 1037, 1054, 277 Cal.Rptr. 269 (1991) ("Evidence of gang membership was critical to prove both motive (retaliation for the death of fellow gang member) and intent to kill (random killings based on hatred), and therefore was central to the case."); *see also People v. Lindberg*, 45 Cal.4th 1, 46–47, 82 Cal.Rptr.3d 323, 190 P.3d 664 (2008), *cert. denied*, ──── U.S. ────, 129 S.Ct. 2799, 174 L.Ed.2d 299 (2009) ("Numerous decisions in federal and other state cases also have upheld the admission of expert testimony to explain the culture and beliefs of White supremacy groups and gangs … when such evidence was relevant to the issues at trial."). In addition, the jury could have drawn the permissible inference from Van Holt's testimony that petitioner was motivated to commit the charged crimes to gain respect for the PEN1 criminal street gang and to send a message not to disrespect the gang or its members. *See People v. Samaniego*, 172 Cal.App.4th 1148, 1169, 91 Cal.Rptr.3d 874 (Cal. Ct.App.2009, *as amended* Apr. 16, 2009) (gang expert testimony admissible to explain that "senseless murders" sent a message "not to disrespect the gang and its members[ ]"); *Olguin*, 31 Cal.App.4th at 1369–70, 37 Cal.Rptr.2d 596 (gang expert's testimony regarding gang territoriality, graffiti, and demonstrations of disrespect to rivals was properly admitted); *see also Windham*, 163 F.3d at 1103–04 (testimony regarding gang behavior was admissible because such evidence demonstrated defendant's potential motive for participating in the alleged crimes); *Pennyman v. Newland*, 2003 WL 23025431, at *6 (N.D.Cal.2003) (gang expert testimony admissible since jury could draw permissible inference that petitioner was motivated to attack victims because of gang rivalry and his role as gang enforcer).

Even assuming, *arguendo*, that the admission of Van Holt's testimony violated petitioner's constitutional rights, the error was harmless. First, the jury was instructed pursuant to CALJIC Nos. 2.80 and 2.82 that an expert's "opinion is only as good as the facts and reasons on which it is based[ ]" and that the jury must "decide from all the evidence whether or not the facts assumed in a hypothetical question [to the expert witness] have been proved." (CT at 381 & 383). Second, petitioner was given ample opportunity to cross-examine Van Holt on the bases of his opinions. (*See* RT at 407–31 & 439–40). Finally, even without the gang expert testimony, there was other evidence that the crimes were gang-related. *See infra* at §§ II.B.3. & III.C.3.; *see also Allen v. Woodford*, 395 F.3d 979, 992 (9th Cir.2005, *as amended* Jan. 24, 2005), *cert. denied*, 546 U.S. 858, 126 S.Ct. 134, 163 L.Ed.2d 137 (2005) ("[T]o the extent that any claim of error … might be meritorious, we would reject that error as harmless because the evidence of [petitioner's] guilt is overwhelming."). Accordingly, the court is persuaded that the state court's decision was neither contrary to, nor an objectively unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Accordingly, Ground Three should be denied.

## B. *Sufficiency of the Gang Evidence.*

In Ground Four, petitioner contends that the evidence was insufficient to establish that he participated in a criminal street gang or committed the attempted murder and the assault for the benefit of a criminal street gang. (Petition at 6; Lodgment No. 8 at 13–14). Petitioner asserts that there was no evidence to "establish [that] the current offense was committed to promote and benefit the gang" because there was "no other gang member involved in any aspect of the offense, there was no touting of any gang name or display of gang hand signals or gestures[,] … no evidence any gang members knew about the incident[, t]he victim was unaware of [petitioner's] gang affiliation and obviously not intimidated by any suspicion [petitioner] was a gang member." (Lodgment No. 8 at 14).

### 1. The Court of Appeal's Opinion.

In analyzing Ground Four, the court of appeal stated:

[Petitioner] attacks the sufficiency of the evidence sustaining the conviction for street terrorism and the gang enhancements attached to the other charges. Specifically, he says there was nothing in the circumstances of the crime indicative of an intent to promote the PEN1 gang: [petitioner] never professed his gang membership, never advocated for his gang before or during the attack and the victim never even knew of [petitioner]'s gang affiliation. Thus, there was no advantage or benefit received by the gang for this incident of "road rage," [petitioner] argues.

The standard of review for the sufficiency of evidence has been oft-quoted. To repeat: Reversal for insufficiency is only warranted if there is *no* credible evidence to support each of the elements of the offense, accepting the evidence in the record below in the light most favorable to the judgment and drawing all reasonable inferences from the information to support the verdict. (*See People v. Carpenter* (1997) 15 Cal.4th 312, 387 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *see also People v. Rowland* (1992) 4 Cal.4th 238, 269 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

The gang expert, detective Van Holt, opined the knife attack on Espinoza was committed to benefit the criminal street gang, PEN 1. Van Holt also testified he had seen "training tapes" by and for

PEN1 members in which the attacker would conceal a knife until he was close enough to inflict a deadly slash, identical to the manner in which [petitioner] attacked Espinoza. Finally, he testified that it is entirely consistent with PEN1 gang behavior for a lone member to attack *without provocation* someone whom they hate for racist reasons, merely for some perceived gesture or motion of disrespect. The purpose is to be violent, display violence and thus gain more respect within their own group.

Street terrorism requires evidence that "1. A person actively participated in a criminal street gang; [¶] 2. The members of that gang engaged in or have engaged in a pattern of criminal gang activity; [¶] 3. That person knew that the gang members engaged in or have engaged in a pattern of criminal gang activity; and [¶] 4. That person directly and actively committed the crime of attempted murder, attempted voluntary manslaughter or assault with a deadly weapon." (CALJIC No. 6.50, as given.) Most of these elements were met by the stipulated admission, given in the form of an instruction by the court to the jury: "[Petitioner] has admitted that PEN1 is a 'Criminal Street Gang', which is an ongoing organization, association, or group of three or more persons, whether formal or informal (1) having as one of its primary activities the commission of one or more of the crimes listed in Penal Code Section 186.22, (2) having a common name or common identifying sign or symbol and (3) whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." He also admitted he was, and had been a member in PEN1. As the jury convicted [petitioner] of the attempted murder of Espinoza, all the elements of the street terrorism charge were met.

Similarly, the elements of the gang enhancements accompanying the alternate charges of attempted murder, assault with a deadly weapon, vehicle theft were met. The court informed the jury the gang enhancement attached to the other charges required proof that: "1. The crimes charged were committed for the benefit of . . . a criminal street gang; and [¶] 2. These crimes were committed with the specific intent to promote, further or assist in any criminal conduct by gang members." (CALJIC No. 17.24.2, as given.) Based on Van Holt's testimony and opinion, [petitioner]'s assault on Espinoza was committed to enhance [petitioner]'s standing in PEN1 and inflict injury on one he perceived as being inferior to him and not deserving of admission into this country. The evidence supported exactly that.

(Opinion at 21–23).

## 2. Applicable Federal Law.

 The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *accord Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005, *as amended* July 8, 2005), *cert. denied*, 546 U.S. 1137, 126 S.Ct. 1142, 163 L.Ed.2d 1000, and *cert. denied*, 546 U.S. 1137, 126 S.Ct. 1145, 163 L.Ed.2d 1000 (2006). Thus, a state prisoner who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. *Herrera v. Collins*, 506 U.S. 390, 402, 113 S.Ct. 853, 861, 122 L.Ed.2d 203 (1993). Nevertheless, a federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due

process grounds." *Juan H.*, 408 F.3d at 1274. In reviewing an insufficient-evidence claim in habeas proceedings, a federal court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (italics in original); *accord Juan H.*, 408 F.3d at 1274. The *Jackson* standard is applied with specific reference to the applicable state law defining the elements of the crime at issue. *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir.) (*en banc*), *cert. denied*, 543 U.S. 956, 125 S.Ct. 415, 160 L.Ed.2d 318 (2004).

 However, a federal habeas court "makes no determination of the facts in the ordinary sense of resolving factual disputes." *Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir.) (internal quotation marks omitted), *vacated in part*, 503 F.3d 822 (9th Cir.2007), and *rev'd on other grounds*, —— U.S. ——, 129 S.Ct. 823, 172 L.Ed.2d 532 (2009). A federal court faced with a factual record "that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793; *accord Wright v. West*, 505 U.S. 277, 296–97, 112 S.Ct. 2482, 2492–93, 120 L.Ed.2d 225 (1992); *Schell v. Witek*, 218 F.3d 1017, 1023 (9th Cir.2000) (*en banc*). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Cordova Barajas*, 360 F.3d 1037, 1041 (9th Cir.2004) (internal quotation marks, brackets and citation omitted); *accord Sarausad*, 479 F.3d at 678. In addition, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330, 115 S.Ct. 851, 868, 130 L.Ed.2d 808 (1995); *accord Sarausad*, 479 F.3d at 678 ("A jury's credibility deter-

minations are entitled to near-total deference[.]") (internal quotation marks and citation omitted).

 The ultimate question on federal habeas review is not whether the court agrees with the jury's conclusions, but only whether those conclusions are within the spectrum of rational results. *Payne v. Borg*, 982 F.2d 335, 338–39 (9th Cir.1992, *as amended* March 2, 1993), *cert. denied*, 510 U.S. 843, 114 S.Ct. 131, 126 L.Ed.2d 94 (1993). Furthermore, in post-AEDPA cases, where a state court has issued a reasoned decision rejecting a claim of insufficient evidence under a standard that is not "contrary to" *Jackson*, a reviewing federal court applies an additional layer of deference. *Juan H.*, 408 F.3d at 1275 n. 13. Thus, the federal court merely inquires "whether a state court determination that the evidence was sufficient to support a conviction was an 'objectively unreasonable' application of *Jackson*." *Sarausad*, 479 F.3d at 677 (italics in original); *see also id.* at 678 ("We therefore evaluate a state court's resolution of a *Jackson* sufficiency-of-the-evidence claim in all cases under § 2254(d)(1) rather than § 2254(d) (2)[.]") (italics in original); *Williams*, 529 U.S. at 409, 120 S.Ct. at 1521 (Under 28 U.S.C. § 2254(d)(1), the federal habeas court asks "whether the state court's application of clearly established federal law was objectively unreasonable.").

### 3. Analysis.

Under California law, "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang" is guilty of street terrorism. Cal.Penal Code § 186.22(a). For purposes

of this offense, "felonious criminal conduct" includes attempted murder, attempted voluntary manslaughter and assault with a deadly weapon. *Id.* at § 186.22(e)(1) & (e)(3). Thus, the crime of street terrorism required the prosecutor to prove that: (1) petitioner "actively participated in a criminal street gang;" (2) "members of that gang engaged in or have engaged in a pattern of criminal gang activity;" (3) petitioner "knew that the gang members engaged in or have engaged in a pattern of criminal gang activity;" and (4) petitioner "directly and actively committed the crime of attempted murder, attempted voluntary manslaughter or assault with a deadly weapon." (CT at 398) (CALJIC No. 6.50); *see also People v. Robles,* 23 Cal.4th 1106, 1115, 99 Cal.Rptr.2d 120, 5 P.3d 176 (2000) ("Those elements are actively participating in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity and willfully promoting, furthering, or assisting in any felonious criminal conduct by members of that gang.") (internal quotation marks, brackets and citation omitted).

■ The California Penal Code also provides for an enhanced sentence for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members[.]" Cal.Penal Code § 186.22(b)(1). This enhancement requires proof of two separate elements: (1) that defendant committed the charged crime for the benefit of, at the direction of, or in association with a gang; and (2) that defendant committed the crime with the specific intent to promote, further or assist in criminal conduct by gang members. *Gardeley,* 14 Cal.4th at 617, 59 Cal.Rptr.2d 356, 927 P.2d 713; *see also Garcia,* 395 F.3d at 1102–03 & n. 5 ("It is important to

keep these two requirements of the gang enhancement separate.").

Having conducted an independent review of the record, the court finds that, viewed in the light most favorable to the prosecution, there was sufficient evidence by which a rational jury could find beyond a reasonable doubt that petitioner committed street terrorism and the attempted murder and assault with a deadly weapon for the benefit of PEN1 and with the specific intent to promote, further or assist in criminal conduct by PEN1 members. First, as an initial matter, the jury found sufficient evidence, which petitioner does not contest, (*see, generally,* Petition at 5–6b; Reply at 1–5), to convict petitioner of attempted murder and assault with a deadly weapon. Second, petitioner stipulated that PEN1 was a criminal street gang, of which he was, and has been, a member. (*See* RT at 55–56, 476 & 481); (CT at 396) ("[Petitioner] has admitted that PENI is a 'Criminal Street Gang', which is an ongoing organization, association, or group of three or more persons, whether formal or informal (1) having as one of its primary activities the commission of one or more of the crimes listed in Penal Code Section 186.22, (2) having a common name or common identifying sign or symbol and (3) whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.").

Finally, there was evidence of petitioner's specific intent to commit the attempted murder and the assault to promote, further, or assist in criminal conduct by PEN1 members. *See People v. Pre,* 117 Cal.App.4th 413, 420, 11 Cal.Rptr.3d 739 (2004) ("Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense."). Van Holt opined that petitioner's knife attack on the victim was committed to benefit the PEN1 crimi-

nal street gang. (*See* RT at 400–01); *People v. Martinez,* 158 Cal.App.4th 1324, 1332, 70 Cal.Rptr.3d 680 (2008) ("The elements of the gang enhancement may be proven by expert testimony."); *see also supra* at § II.A.3. (finding that the admission of the gang expert's testimony did not violate petitioner's due process rights). Van Holt testified that he had seen PEN1 "training tapes" in which an attacker would conceal a knife in a manner similar to the method used by petitioner and then attack the victim when he was close enough to the victim. (*See* RT at 403; *see also id.* at 165–67). Van Holt also testified that it was the PEN 1 modus operandi for a lone gang member to attack without apparent provocation merely for racist reasons and in response to a perceived gesture of disrespect. (*See id.* at 401). Finally when petitioner slashed the victim's throat, the knife severed the Star–of–David chain hanging around the victim's neck, which petitioner grabbed before fleeing. (*See id.* at 113–14 & 166–67). The jury could have reasonably inferred that petitioner grabbed the Star–of–David chain as a "souvenir" to prove to his fellow gang members that his victim was a target of the gang's racial and ethnic hatred.

Petitioner contends that "[t]he evidence established [petitioner] committed the offenses due to anger of the road rage variety[,]" and not to benefit PEN 1. (Lodgment No. 8 at 14). Petitioner's assertions are premised on his version of the incident and interpretation of the evidence. (*See id.* at 13–14); (*see also* RT at 455–60) (arguing at trial that petitioner acted out of road rage with no links to his gang membership). However, a federal habeas court faced with a factual record "that supports conflicting inferences must presume ... that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson,* 443 U.S. at 326, 99 S.Ct. at 2793; *see Sarausad,* 479 F.3d at 678 (A federal

habeas court "makes no determination of the facts in the ordinary sense of resolving factual disputes.") (internal quotation marks omitted).

In short, viewing the evidence in the light most favorable to the prosecution, a jury could reasonably conclude that petitioner attacked the victim with the specific intent to promote, further, or assist other gang crimes. *See Gardeley,* 14 Cal.4th at 619, 59 Cal.Rptr.2d 356, 927 P.2d 713 (finding specific intent to further gang activity where expert opined "that criminal street gangs rely on such violent assaults to frighten the residents of an area where the gang members sell drugs, thereby securing the gang's drug-dealing stronghold[ ]"). The *Jackson* standard is a high one for habeas petitioners to overcome, *Jones v. Wood,* 207 F.3d 557, 563 (9th Cir.2000), and in this case, petitioner simply cannot meet it. Accordingly, Ground Four should be denied.

## III. PREJUDICIAL EVIDENCE.

In Ground One, petitioner contends he was prejudiced by the trial court's failure to bifurcate the gang enhancement allegations from the other charges. (Petition at 5). In Ground Two, petitioner asserts he was prejudiced by the evidence of his prior convictions. (*Id.*).

### A. *Applicable Federal Law.*

 "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). Under narrow circumstances, the misapplication of state statutory or decisional law or evidentiary rules may violate federal due process safeguards. *See Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990);

*Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 874–75, 79 L.Ed.2d 29 (1984); *Ortiz v. Stewart,* 149 F.3d 923, 941 (9th Cir.1998), *cert. denied,* 526 U.S. 1123, 119 S.Ct. 1777, 143 L.Ed.2d 806 (1999). Thus, federal habeas courts are "limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process" violation. *Jeffers,* 497 U.S. at 780, 110 S.Ct. at 3102.

▆ The erroneous admission of evidence violates due process only if it is so prejudicial that it renders a trial fundamentally unfair. *See McGuire,* 502 U.S. at 70, 112 S.Ct. at 481; *Dubria v. Smith,* 224 F.3d 995, 1001 (9th Cir.2000), *cert. denied,* 531 U.S. 1148, 121 S.Ct. 1089, 148 L.Ed.2d 963 (2001). The erroneous admission of evidence renders a trial fundamentally unfair only if there are no permissible inferences the trier of fact can draw from it. *Boyde,* 404 F.3d at 1172; *Houston,* 177 F.3d at 910 n. 6; *Jammal,* 926 F.2d at 920. Thus, "[a] habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde,* 404 F.3d at 1172.

### B. *Ground One.*

▆ In Ground One, petitioner contends the trial court abused its discretion in denying his request to bifurcate the gang enhancement allegation. (Lodgment No. 8 at 7); (*see also* Reply at 1–2) (arguing that the trial court's decision violated state law). He asserts that because "the gang evidence was fairly inflammatory[,]" it "had the potential to 'spill over' to bolster the 'weak' case of attempted murder." (Lodgment No. 8 at 7).

### 1. The Court of Appeal's Opinion.

In analyzing Ground One, the court of appeal stated:

[Petitioner] requested the court to bifurcate the issue of the criminal street gang enhancement from the substantive

charges, but the court refused, permitting the bifurcation as to the two prior prison terms but not the gang enhancement and the street terrorism charge. [Petitioner] characterizes this ruling as an abuse of discretion because without the gang evidence, there would have been no proof of his motive or intent to support the attempted murder and assault charges. Thus, he concludes, he would have been acquitted of the attempted murder count, and the court's error requires reversal of that conviction. We disagree.

A trial court has broad discretion in controlling the conduct of a criminal trial. (See § 1044; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 [16 Cal. Rptr.3d 880, 94 P.3d 1080].) The court denied the request to bifurcate not "because it believed it lacked authority to bifurcate, but as an exercise of its discretion. We see no abuse of that discretion." (*Ibid.*) The *Hernandez* court noted that a gang enhancement is "different from [a] prior conviction . . . [because it] is attached to the charged offense and is, by definition, inextricably intertwined with that offense. [Thus,] less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation." (*Ibid.*)

Additionally, as the Attorney General validly emphasizes, evidence of the gang's reputation and behavior would have been admitted at trial irrespective of the enhancement's bifurcation because [petitioner] faced the substantive charge of street terrorism which was not subject to "bifurcation." (See *People v. Burnell* (2005) 132 Cal.App.4th 938, 947 [34 Cal.Rptr.3d 40]) ["Thus to entirely eliminate the gang evidence would have required a severance . . . of the street terrorism count *and* the bifurcation of the gang enhancements." (Italics added.).] As [petitioner] failed to make any

motion to sever the street terrorism count from the rest of the crimes committed at the same time, the bifurcation of the gang enhancement would have been functionally meaningless. (*Id.* at p. 948 [34 Cal.Rptr.3d 40].)

*Had* [petitioner] raised a severance motion, it would have been most probably denied. Joint trials of offenses which occur together are legislatively preferred over separate trials, and the party requesting severance of properly joined offenses carries a very heavy burden to " 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried' " before such a severance can be granted. (*People v. Burnell, supra,* 132 Cal.App.4th at 946 [34 Cal.Rptr.3d 40]; § 954.) "Severance of charged offenses is a more inefficient use of judicial resources ... because severance requires selection of separate juries, and the severed charges would always have to be tried separately[.]" (*People v. Hernandez, supra,* 33 Cal.4th at 1050 [16 Cal. Rptr.3d 880, 94 P.3d 1080].) As the street terrorism count was merely an alternate charge to the attempted murder and assault counts—thus, requiring much the same evidence to prove—and no more potentially inflammatory than those other charges, severance would not have been appropriate even had [petitioner] requested it. (E.g., *Hernandez, supra,* 33 Cal.4th at 1051 [16 Cal. Rptr.3d 880, 94 P.3d 1080].)

[Petitioner] distinguishes his situation from those cases in which bifurcation of gang enhancements was properly denied by arguing the gang expert's testimony involved matters *not* relevant to the actual motive and intent to prove the attempted murder and assault. Invoking the archaic rule of cross-admissibility of other-crimes evidence enunciated in *Williams v. Superior Court* (1984) 36 Cal.3d 441 [204 Cal.Rptr. 700, 683 P.2d

699], [petitioner] contends bifurcation of gang enhancements *should* be granted whenever the gang evidence is not cross-admissible in the trial of the underlying crimes.

Irrespective of the accuracy of this position, it does not benefit [petitioner] because, as noted above, such evidence would have been admissible in his trial due to the street terrorism charge even if the gang enhancement had been bifurcated. Thus, cross-admissibility was met in his case and no prejudice resulted from the denial of bifurcation. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 985 [108 Cal.Rptr.2d 291, 25 P.3d 519] [if cross-admissibility met, no possible prejudice by admitting evidence].) (Opinion at 4–6).

### 2. Analysis.

 In determining whether the trial court's decision not to bifurcate the gang enhancement allegation violated petitioner's constitutional rights, the court "do[es] not depend on the state law governing severance in state trials." *Grisby v. Blodgett,* 130 F.3d 365, 370 (9th Cir. 1997). Nor does the court "consider procedural rights to severance afforded in federal trials." *Id.* Instead, the court determines whether the decision not to bifurcate violated petitioner's due process rights. *Featherstone v. Estelle,* 948 F.2d 1497, 1503 (9th Cir.1991) ("The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.") (internal quotation marks and citation omitted). Petitioner bears the burden of demonstrating that the trial court's decision not to bifurcate rendered his trial fundamentally unfair. *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir.2003, *as amended* Sept. 21, 2004), *cert. dismissed,* 545 U.S.

1165, 126 S.Ct. 410, 162 L.Ed.2d 933 (2005) ("We may grant habeas relief on a joinder challenge only if the joinder resulted in an unfair trial. There is no prejudicial constitutional violation unless simultaneous trial of more than one offense actually rendered petitioner's state trial fundamentally unfair and hence, violative of due process.") (internal quotation marks, alterations and citation omitted); *Sandoval v. Calderon,* 241 F.3d 765, 771–72 (9th Cir.2000, *as amended* Feb. 21, 2001), *cert. denied,* 534 U.S. 847, 122 S.Ct. 112, 151 L.Ed.2d 69, and *cert. denied,* 534 U.S. 943, 122 S.Ct. 322, 151 L.Ed.2d 241 (2001) ("On habeas review of a prisoner's challenge to a trial court's failure to sever trial of some counts in an indictment, we may only grant the writ if the joinder resulted in an unfair trial.").

 "In evaluating prejudice, the [federal habeas court] focuses particularly on cross-admissibility of evidence and the danger of 'spillover' from one charge to another, especially where one charge or set of charges is weaker than another." *Davis,* 384 F.3d at 638. Undue prejudice also exists "whenever joinder of counts allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible." *Sandoval,* 241 F.3d at 772. The danger in these situations is that the jury may find it difficult "to compartmentalize the damaging information." *Id.*

Here, the failure to bifurcate the gang enhancement allegation did not render petitioner's trial fundamentally unfair. First, the gang evidence would have been otherwise admissible for the street terrorism charge. *See supra* at § II.B.3. (both the street terrorism and gang enhancement charges require evidence that petitioner promoted, furthered or assisted in criminal conduct by gang members). Giv-

en that petitioner did not file a motion to sever the street terrorism charge from the other charges,[7] (*see* RT at 19; CT at 278–84) (filing a pretrial motion to bifurcate the gang charges), bifurcation of the gang enhancement allegations would have been improper.

Second, even assuming that the trial court should have bifurcated the gang enhancement and severed the street terrorism charge, petitioner has not demonstrated any prejudice. Petitioner argues that "the [gang] evidence was not cross-admissible because there was no proper use for this evidence to prove motive or intent in the commission of the assault with a knife." (Lodgment No. 8 at 8). On the contrary, as discussed above, the gang expert's testimony was admissible to prove both motive and intent. *See supra* at § II.A.3.; *Lindberg,* 45 Cal.4th at 46–47, 82 Cal.Rptr.3d 323, 190 P.3d 664 ("Numerous decisions in federal and other state cases also have upheld the admission of expert testimony to explain the culture and beliefs of White supremacy groups and gangs ... when such evidence was relevant to the issues at trial."); *Samaniego,* 172 Cal.App.4th at 1168, 91 Cal.Rptr.3d 874 (gang expert testimony admissible to explain that "senseless murders" sent a message "not to disrespect the gang and its members[ ]"). Further, the gang evidence was not cumulative. (*See* Reply at 2) (contending that because petitioner had stipulated that he was a member of a criminal gang, the additional gang evidence would have been cumulative). The evidence countered petitioner's argument that his attack on the victim was motivated by road rage, not gang affiliation. (*See* Lodgment No. 8 at 14; RT at 455–60). Thus, because the gang-related evidence

---

7. Under California law, to request separate trials of substantive counts requires a motion to sever while enhancements are subject to a motion to bifurcate. *People v. Burnell,* 132 Cal.App.4th 938, 946 & n. 5, 34 Cal.Rptr.3d 40 (2005).

was cross-admissible to the attempted murder and assault charges, petitioner's due process rights were not violated. *See Sandoval,* 241 F.3d at 772 ("This cross-admissibility dispels the prejudicial impact of joining all counts in the same trial.").

In sum, because petitioner was not prejudiced by the decision not to bifurcate the gang enhancement allegation, the trial court's decision was not fundamentally unfair and did not violate due process. *See Jeffers,* 497 U.S. at 780, 110 S.Ct. at 3102 (federal habeas courts are "limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process" violation). The court is persuaded that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Accordingly, Ground One must be denied.

### C. *Ground Two.*

#### 1. **Relevant Background.**

 The trial court granted petitioner's pretrial motion to exclude any reference to petitioner's prior convictions or parole status. (*See* RT at 37–38 & 47; CT at 295). Prior to hearing testimony from Michael Sharpe ("Sharpe"), the Orange County Sheriff's Deputy who arrested petitioner in Lake Elsinore, the court admonished Sharpe "not [to] refer to any of the individuals in Lake Elsinore as parolee at large[.]" (*See* RT at 335 & 337). However, during his testimony, Sharpe stated that he had "arrested [petitioner] in the past[ ]" and that parolee-at-large officers were involved in the stakeout that led to petitioner's arrest. (*Id.* at 340–41 & 342–44).

Immediately thereafter, petitioner's counsel made a motion for a mistrial. (RT

at 345). Counsel argued that Sharpe's testimony left

> the clear inference . . . that [petitioner] has prior gang criminal activity, which is character evidence, which is irrelevant, which is prejudicial, which has I think irrevocably harmed [petitioner]. In effect [the jury are] now viewing him as a gang member with priors. I don't know how we fix that short of—well, I don't know how we fix that.

(*Id.* at 346). The trial court did not find the testimony "so prejudicial that it would deny [petitioner] a fair trial." (*Id.* at 348). The court denied the motion without prejudice to petitioner renewing it after the gang expert testified.[8] (*Id.*). Further, the trial court contemporaneously admonished the jury as follows:

> Ladies and gentlemen, so there's no misunderstanding here, I have consulted with both counsel. There is absolutely no history that [petitioner] has ever been arrested for any gang-related offense or in association with. So, if you were drawing an inference somehow from this witness'[s] testimony that [petitioner] had been arrested prior—on prior occasions relating to gang activity, that is incorrect. He has not.

(*Id.*).

During deliberations, the jury requested a read-back of Sharpe's testimony, "specifically what was said about [petitioner's] prior arrest record and then the court's direction as to how we were to handle that testimony[.]" (CT at 332). The court responded:

> The testimony of Detective Sharpe was only relevant to the issues of active participation in a criminal street gang, motive and whether any of the crimes were

---

**8.** Petitioner did not renew the motion for mistrial after the expert's testimony. (*See,* *generally,* RT at 440–44).

committed for the benefit of, at the direction of or in association with a criminal street gang. The Court informed you that none of [petitioner]'s prior arrests were gang related.

(*Id.* at 333).

## 2. The Court of Appeal's Opinion.

In analyzing Ground Two, the court of appeal stated:

The court ruled in limine that no mention of [petitioner]'s prior convictions or parole status could be made. However, during the trial, Michael Sharpe, a detective who arrested [petitioner] in the house near Lake Elsinore, testified that he had arrested [petitioner] at least once before, and that [petitioner] had been identified by a parole agent before the officers entered the house to effectuate the arrest. [Petitioner]'s counsel immediately raised a motion for mistrial.

The trial court, attempting to cure the harm from the alleged error, offered to instruct the jury that [petitioner] had never been arrested for any *gang-related* offense in the past. His counsel accepted the admonishment but *only* after the court denied his motion for mistrial first.

[Petitioner] now contends the court's remedy was insufficient to cure the harm from the violation of the in limine ruling. Invoking the standard set out in *People v. Woodberry* (1970) 10 Cal. App.3d 695, at page 708 [89 Cal.Rptr. 330], he argues the violation was incurably prejudicial. However, the trial court found the violation was *not* intentional as the instruction given to the officer failed to refer directly to the matters revealed in his testimony.

The denial of a motion for mistrial is within the trial court's discretion and may be reversed only upon a showing of a clear abuse of that discretion. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1154–1155 [36 Cal.Rptr.2d 235, 885 P.2d 1]; see also *People v. Hines* (1997) 15 Cal.4th 997, 1038 [64 Cal.Rptr.2d 594, 938 P.2d 388].) The in limine ruling forbade any testimony regarding [petitioner]'s prior convictions and his parole status. The court denied the mistrial motion because the testimony did not directly violate that order. The judge understood the defense's concern, however, and offered to cure whatever harm ensued by instructing the jury [petitioner] had never been arrested for gang-related offenses. The court emphasized that whatever insinuation concerning prior offenses was made by Sharpe's testimony, such information would have been eventually admitted via the gang expert's testimony. The court suggested the defense renew its motion *if* the gang expert were not to testify concerning these facts. No renewed motion was made. Moreover, [*petitioner*] readily testified to his own prior convictions.

Mistrial is warranted if error occurred of an incurably prejudicial nature. (See *People v. Rodrigues, supra,* 8 Cal.4th at 1154 [36 Cal.Rptr.2d 235, 885 P.2d 1].) The assessment of potential prejudice is, by nature, speculative, and the court's weighing and finding the balance in favor of no prejudice must be accorded great deference. (See *People v. Price* (1991) 1 Cal.4th 324, 430–431 [3 Cal. Rptr.2d 106, 821 P.2d 610].) As the evidence came to the jury's attention via the [petitioner]'s own testimony anyway, we cannot say the trial court erred in its determination.

[Petitioner] responds that we, as the reviewing court, cannot consider what evidence came before the jury subsequent to the motion for mistrial.. He notes that "a trial court ruling must be evaluated on the basis of evidence, argument, and information before the court at the time of the ruling." But [petitioner] misreads the trial court's denial of

the mistrial motion: The court emphasized that the testimony triggering the mistrial motion was not a direct violation of the court's order *and* the information's admission was inevitable via proper channels. Thus, on *two* grounds, the mistrial was not necessary. The trial court was accurately prophetic, and its reasons for deciding the error was not *incurably* prejudicial were later corroborated when the evidence *did* come before the jury via [petitioner] himself. But the bases for the denial were proper although one of them was premised on *future* events in the trial. That is not unusual for a court to consider in assessing the *potential* prejudice at the time of a mistrial motion: The court must consider *all* information it has available to it to determine whether the harm from the error can be cured. In reviewing that determination, we affirm the ruling for its appropriateness at the time it was made, and that no subsequent event undermined that assessment. (E.g., *People v. Holloway* (2004) 33 Cal.4th 96, 151 [14 Cal.Rptr.3d 212, 91 P.3d 164].)

[Petitioner] replies that the harm was irreparable because it maligned his character, casting him in the light of an escaped parolee with numerous arrests. But the trial court instructed the jury with the statement that "there is absolutely no history that [petitioner] has ever been arrested for any gang-related offense or in association with. So if you were drawing an inference somehow from this witness'[s] testimony that [petitioner] had been arrested ... on prior occasions relating to gang activity, that is incorrect. He has not."

Subsequently, the court received a question from the deliberating jury, asking to have the testimony of that detective read back to them regarding "[petitioner]'s prior arrest record and then the court's direction as to how [it was to] handle that testimony." The court submitted a written instruction to them to disregard those aspects of Sharpe's testimony and that "[t]he testimony of Detective Sharpe was only relevant to the issues of active participation in a criminal street gang, motive and whether any of the crimes were committed for the benefit of, at the direction of or in association with a criminal street gang. The Court informed you that none of [petitioner]'s prior arrests were gang related...."

Nothing about the jury's question—and the court's response—would indicate the jury intended to improperly use the information of his prior arrests. On the contrary, we must presume that the jury *followed* the court's immediate curative admonition and instruction. (See *People v. Morris* (1991) 53 Cal.3d 152, 217–218 [279 Cal.Rptr. 720, 807 P.2d 949] ["the jury was carefully instructed not to consider evidence of crimes other than those of which defendant had been convicted. The jury is presumed to have followed the limiting instruction."].) Had the court *not* clearly told the jury to disregard the brief mention of prior arrests, then [petitioner]'s argument would be convincing. The court, however, fulfilled its role of curing minor errors by quickly eliminating any possibility of misuse.

(Opinion at 6–8).

### 3. Analysis.

Petitioner contends that "the judgment must be reversed because his right to a fair trial was irreparably damaged by [Sharpe's] violation of in limine orders." (Lodgment No. 8 at 10). He argues that because "the information about [petitioner] being on parole and being arrested by parolee-at-large officers was inherently likely to inflame the passion of the jury, an admonition is not sufficient to cure the

prejudice." (*Id.*). Petitioner's contentions are unpersuasive.

First, the jury was given a contemporaneous instruction that they were not to assume from Sharpe's testimony that petitioner had been previously arrested for any gang activity.[9] (See RT at 348) ("There is absolutely no history that [petitioner] has ever been arrested for any gang-related offense or in association with. So, if you were drawing an inference somehow from this witness'[s] testimony that [petitioner] had been arrested prior—on prior occasions relating to gang activity, that is incorrect. He has not."). A timely limiting instruction generally cures the prejudicial impact of evidence. *See Bayramoglu v. Estelle,* 806 F.2d 880, 888 (9th Cir.1986) ("A timely instruction from the judge usually cures the prejudicial impact of evidence unless it is highly prejudicial or the instruction is clearly inadequate.") (internal quotation marks and citation omitted).

Further, when the jury sought clarification during deliberations, the court admonished them that "[t]he testimony of Detective Sharpe was only relevant to the issues of active participation in a criminal street gang, motive and whether any of the crimes were committed for the benefit of, at the direction of or in association with a criminal street gang." (CT at 333). Petitioner contends that the jury's question during deliberations implies that the curative instruction was inadequate. (*See* Reply at 3) ("Furthermore, incurable prejudice was suffered by the Petitioner where the inadmiss[i]ble information remained and was clearly discussed during deliberations. Given this, the 'curative instructions' were plainly an insufficient safeguard of Due Process."). On the contrary,

the jury's question indicates that they were intensely aware of the trial court's admonitions and concerned that they consider only the appropriate evidence. (*See* CT at 332) (requesting a read back of Sharpe's testimony and "the *court's direction as to how we were to handle that testimony[ ]*") (emphasis added). Thus, the trial court foreclosed any chance that Sharpe's brief comments about a prior arrest and parolee-at-large officers would taint the jury with unfair propensity evidence.

Finally, even assuming, *arguendo,* that the trial court's denial of petitioner's motion for mistrial was erroneous, petitioner has not demonstrated that it rendered his trial fundamentally unfair. During petitioner's subsequent testimony, he admitted to having two prior felony convictions. (*See* RT at 479); *cf. United States v. Williams,* 939 F.2d 721, 723–24 (9th Cir.1991) (by preemptively introducing the prior convictions during his direct testimony, defendant waived any subsequent constitutional challenge to their admission). Further, there was overwhelming evidence implicating petitioner in the crimes. The victim testified that during the altercation, petitioner got out of his car and started toward him and his family with his hand hidden behind his thigh. (*See* RT at 155 & 165–66). Suddenly, and without warning, petitioner slashed the victim's throat with a knife. (*See id.* at 166–67). The wound to the victim's neck required extensive suturing and could have been fatal. (*See id.* at 190–92 & 201–10). Van Holt testified that petitioner's knife attack was committed to benefit the PEN 1 criminal street gang. (*See id.* at 406–07). Petitioner admitted the general pattern of events but

---

**9.** It is presumed that jurors follow their instructions. *See Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 733, 145 L.Ed.2d 727 (2000) (It is an almost-unwavering presump-

tion that jurors follow their instructions.); *accord Drayden v. White,* 232 F.3d 704, 713 (9th Cir.2000), *cert. denied,* 532 U.S. 984, 121 S.Ct. 1630, 149 L.Ed.2d 491 (2001).

argued that his reactions were an act of road rage and that he had swung the knife at the victim to get him to back off. (*See id.* at 455–60).

In short, petitioner has not met his "heavy burden" to demonstrate that the trial court's decision was fundamentally unfair. *See Boyde,* 404 F.3d at 1172 (the admission of evidence violates due process only if there are *no* permissible inferences the trier of fact can draw from it). The court is persuaded that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Accordingly, Ground Two must be denied.

## IV. JURY INSTRUCTIONS.

 In Ground Five, petitioner contends the trial court erred in failing to *sua sponte* give a limiting instruction regarding the gang expert's reliance on hearsay evidence. (Petition at 6). In Ground Six, he asserts that his trial counsel was ineffective for failing to request such a limiting instruction. (*Id.* at 6a).

### A. *The Court of Appeal's Opinion.*

In analyzing Grounds Five and Six, the court of appeal stated:

[Petitioner] contends the court erred by failing to give a sua sponte limiting instruction concerning remarks the gang expert relied upon in forming his expert opinion concerning [petitioner]. Specifically, the gang expert testified to, and relied upon extrajudicial statements made by [petitioner] to Colleen Backus—the mother of his then-girlfriend— that he hated "Mexicans, Blacks, [and] Jews and that they didn't belong in this country...." Although [petitioner] denied ever making such a statement, the court permitted that testimony, although it excluded any reference to another

statement by [petitioner] denying the Holocaust ever occurred.[FN5]

[FN5] [Petitioner] reputedly stated that "the Holocaust is a fiction" but the court ruled it was too prejudicial for admission.

The court instructed the jury sua sponte as to the proper use of expert opinion testimony and how to weigh such information via the standard instruction, CALJIC No. 2.80.[FN6] However, it did not give a limiting instruction as to the information on which the expert relied. [Petitioner] contends the trial court fundamentally erred by this failure and demands reversal and retrial for it because the prosecutor referred to the statements provided to the expert by Backus, although the prosecutor had never called Backus to testify to the statements.

[FN6] CALJIC No. 2.80 states, in pertinent part, "A witness who has special knowledge, skill, experience, training or education in a particular subject has testified to certain opinions. This type of witness is referred to as an expert witness. In determining what weight to give to any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion. [¶] ... If you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based. [¶] You are not bound by an opinion. Give each opinion the weight you find it deserves...."

The court *did* instruct the jury sua sponte regarding the limited use of gang culture evidence. It informed the jury it "may not be considered by you to prove [petitioner] is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] 1. The existence of

the specific intent and knowledge which are necessary elements of the gang crime and enhancement charged, [¶] 2. A motive for the commission of the crimes charged, [¶] 3. Its effect, if any, on a witness'[s] testimony. [¶] 4. The basis for an expert's opinion. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

[Petitioner] acknowledges that a trial court is generally not obligated to instruct sua sponte as to the limitation on the use of admitted evidence. (See *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1316 [97 Cal.Rptr.2d 727].) But he argues that *if* the court was to instruct at all, it had to instruct accurately and its sua sponte limiting instruction was defective in that it failed to inform that hearsay could not be used to prove the truth of the matter stated, notwithstanding its admission via the expert to explain his opinion.

The Attorney General responds that the evidence entered without a timely objection, and without surprise to the opposing party. Even " ' "incompetent testimony, such as hearsay or conclusion, if received without objection takes on the attributes of competent proof when considered upon the question of sufficiency of the evidence to support a finding." ' [Citations.]" (*People v. Panah* (2005) 35 Cal.4th 395, 476 [25 Cal. Rptr.3d 672, 107 P.3d 790].) [Petitioner] responds that this error by counsel did not absolve the court's duty of correctly instructing the jury, irrespective of the merits—or inapplicability—of the *Panah* reference. Moreover, he asserts ineffective assistance of trial counsel for the failure to object and prosecutorial misconduct for misuse of the evidence in argument.

The Attorney General replies that had a timely objection been entered, the prosecutor would have called Backus to testify directly to the statements which then might have carried much greater weight with the jurors than in its secondary delivery via the expert. Thus, a logical tactical consideration was present for counsel's failure to object. Moreover, *[petitioner]* presents a valid reason for counsel's failure to object: an obvious basis for admission of the evidence was the expert's reliance on it to form his opinion. (Cf.Evid.Code, § 801, subd. (b).)

However, had [petitioner]'s counsel objected on the basis of hearsay, the court and the prosecutor would have been alerted to the *alternative* ground for objection and could have responded appropriately either in the court's sua sponte instruction or by the prosecutor calling the witness to testify. The requirement of a timely and specific objection to evidence is premised on situations such as this: The evidence has various potential uses and an objection must clearly delineate the reason for exclusion so that the court can appropriately notice the objectionable use from the unobjectionable application. (Cf. 4 Witkin, Cal. Evidence) (3d ed. 2000) Presentation at Trial, § 376, p. 468 [The following must appear clearly from the objection: "If, under the doctrine of limited admissibility . . . the evidence is admissible for some purpose or against some party, the issue or against which party the evidence is inadmissible."] Moreover, a defective specific objection is a *waiver* of the alternate grounds for objecting. (*Id.* at § 379, p. 469.)

[Petitioner]'s responsive argument fails, however, because he cannot meet his burden of showing prejudice. [ FN7] Had either the court or the prosecutor been at all aware that [petitioner] would

be arguing for the first time on appeal that one possible basis for an objection to the Backus declaration was for its hearsay use, one or both of them would have cured the possibility pronto. Clearly, the prosecutor *thought* he had called Backus to testify because he argued, "you heard from the girlfriend's mother, . . . [about his] hatred of Blacks, Mexicans, and Jews . . . ." Thus, the prosecutor did not *intentionally* misstate the evidence.

[ FN7] See *People v. Weaver* (2001) 26 Cal.4th 876 at page 961 [111 Cal.Rptr.2d 2, 29 P.3d 103]: " . . . [T]he question whether counsel is constitutionally ineffective comprises two inquiries: (1) Was counsel's performance deficient? and (2) was there prejudice?" (See also *Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

[Petitioner] replies that the prosecutor's *intention* in committing misconduct is irrelevant. It is the potential injury to [petitioner] that is of paramount importance, citing *People v. Bolton* (1979) 23 Cal.3d 208, at pages 213–214 [152 Cal.Rptr. 141, 589 P.2d 396]. He emphasizes that this prosecutor crossed the line between zealous advocacy and misconduct by arguing that Backus had testified to the statements when he had never actually called her to testify at all. Thus, he referred to facts not admitted into evidence at trial, an action absolutely unconscionable for a prosecutor. (Cf. *People v. Hill* (1998) 17 Cal.4th 800, 828–829 [72 Cal.Rptr.2d 656, 952 P.2d 673].)[ FN8]

[ FN8] In *Hill,* the prosecutor repeatedly referred to facts not in evidence during her final argument. The court noted that it had found "such practice is " 'clearly misconduct' [citation], because such statements 'tend to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effective-

ly circumventing the rules of evidence." [Citations.]' " However, the reversal of the conviction resulted not from the prosecutor's repeated misstatements of facts not in evidence, but from the "sheer number of the instances of prosecutorial misconduct [of many varieties], together with the other trial errors. . . . Considered together, we conclude they created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors. Considering the cumulative impact of [the prosecutor]'s misconduct, at both the guilt and penalty phases of the trial, together with the *Carlos* [*v. Superior Court* (1983) 35 Cal.3d 131, 197 Cal.Rptr. 79, 672 P.2d 862] error and the other errors throughout the trial, we conclude defendant was deprived of that which the state was constitutionally required to provide and he was entitled to receive: a fair trial." (*People v. Hill, supra,* 17 Cal.4th at p. 847 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

To preserve a claim of prosecutorial misconduct, however, the defense must lodge a timely and specific objection to the offending act or word and request a curative admonishment from the court. (See *People v. Cox* (2003) 30 Cal.4th 916, 952 [135 Cal.Rptr.2d 272, 70 P.3d 277].) Again, [petitioner] responds that his counsel ineffectively represented him by failing to object to the prosecutor's argument. In this instance, he posits there was no possible explanation for counsel's failure to object; the effect of the failure was the court's failure to properly instruct the jury as to the limited use of the offending testimony which the prosecutor then misused in his final argument, denying [petitioner] his right to a fair trial.

Interestingly, [petitioner] only asserts his right to a fair trial was denied as to the attempted murder count, although the same testimony was clearly applicable to *all* the charges due to the gang enhancements. However, he contends only the attempted murder count was unduly affected by the reference because it was the sole *erroneously pro-*

*vided* evidence of motive, without which the jury would not have found he harbored the requisite malice and premeditation.

The statement was not the sole evidence of premeditation.[ FN9] [Petitioner] swerved out of a parking lot into the path of Espinoza's car, forcing him out of his lane and into the oncoming traffic lane. He then followed Espinoza and forced him off the road *again* upon his turning into the side street. [Petitioner] then approached him, *hiding* a deadly weapon from Espinoza's view until he was close enough to inflict the (potentially) fatal blow. Such actions are clear evidence of planning and premeditation. Moreover, [petitioner]'s obvious membership in the most extreme and violent white supremacist gang was synonymous with professions of white supremacy. His statements of such profession to Backus were merely reiterations of his beliefs displayed by his gang membership and participation. Thus, the single slip of the tongue by the prosecutor in saying the jurors had "heard from the girlfriend's mother [about] the hatred ... of Blacks, Mexicans and Jews ...." did nothing more than slightly increase the substantial evidence against [petitioner] that he was a white supremacist who would violently oppose any person he hated for racist reasons.

---

[ FN9] As the jurors were informed, deliberation is defined as "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. 'Premeditated' means considered beforehand. [¶] If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is [an] attempt to commit willful, deliberate, and premeditated murder. [¶] The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated.... [¶] The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, ..." (CALJIC No. 8.67, as given.)

The prosecutor's error harmed the prosecutor more than it harmed [petitioner]. The jurors knew—if they even heard the prosecutor's slip—that they had *not* heard from Colleen Backus. They may have recognized the statement via the gang expert as having come from Backus, but they assuredly knew they had not heard or seen her testify. They received an instruction from the court telling them that what attorneys say is not the law, and that they were to follow the court's instructions irrespective of what the attorneys might say. (See CALJIC No. .50, as given.) The effect of the slip, at most, was for the jurors to *lose* respect for the prosecutor due to his lack of memory or clear recall.

Thus, the prosecutor's error was not of such fundamental importance as to undermine the verdict (cf. *People v. Rowland* (1992) 4 Cal.4th 238, 274–277 [14 Cal.Rptr.2d 377, 841 P.2d 897] ), considering the evidence itself was properly admitted for another purpose, the jury was instructed that its limited use was to prove [petitioner]'s gang membership, and there was substantial evidence of his racist views as indicated by his undisputed gang membership in PEN1, a violent white supremacist group. The prosecutor's slip was his lone mistake in a complicated trial, not the "rude and intemperate behavior [which] violates the federal Constitution when it comprises a *pattern* of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process....' " (*People v. Espinoza*

(1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204].)

Because the prosecutor's error was not such as to undermine the confidence in the verdict, the defense counsel's failure to object to it was not prejudicial. (See fn. 7, *ante*.) Initially, we note counsel may have legitimately chosen *not* to object, fearing that an objection would merely highlight the importance of the racist information. Irrespective of counsel's reasons for failing to object, no prejudice has been shown: Substantial evidence of [petitioner]'s racism was properly admitted in evidence against him. To be specific, he personally stipulated to his membership in PEN1, the undisputedly violent criminal street gang advocating white racism, and to its inherently criminal nature and customs. The one, brief mention of the statement by Backus in final argument could not have affected the jury more than the properly admitted evidence of his hatred and racism.

(Opinion at 12–17).

B. *Applicable Federal Law.*

 In evaluating a claim of instructional error, the jury instruction in question " 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *McGuire*, 502 U.S. at 72, 112 S.Ct. at 482 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)); *see also Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir.1995), *cert. denied*, 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996). In addition, it is not sufficient to show that "the instruction is undesirable, erroneous, or even 'universally condemned.' " *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977) (quoting *Cupp*, 414 U.S. at 146, 94 S.Ct. at 400); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) (before habeas relief is granted due to instructional error, "it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [constitutional] right") (internal quotation marks and citation omitted); *accord Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir.2001), *cert. denied*, 535 U.S. 935, 122 S.Ct. 1313, 152 L.Ed.2d 222 (2002). Nor is it sufficient that the jury instruction is allegedly incorrect under state law. *See McGuire*, 502 U.S. at 71–72, 112 S.Ct. at 482.

 "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155, 97 S.Ct. at 1737; *Murtishaw*, 255 F.3d at 971–72. When an instruction is allegedly ambiguous, the court must ask "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990); *accord McGuire*, 502 U.S. at 72, 112 S.Ct. at 482; *Murtishaw*, 255 F.3d at 967; *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir.2000), *cert. denied*, 534 U.S. 839, 122 S.Ct. 94, 151 L.Ed.2d 55 (2001). Where the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy." *Henderson*, 431 U.S. at 155, 97 S.Ct. at 1737; *accord Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir.1997), *cert. denied*, 522 U.S. 1079, 118 S.Ct. 860, 139 L.Ed.2d 759 (1998).

 In short, a claim of instructional error requires federal habeas relief only where the error " 'by itself so infected the entire trial that the resulting conviction violates due process.' " *McGuire*, 502 U.S. at 72, 112 S.Ct. at 482 (quoting *Cupp*, 414 U.S. at 147, 94 S.Ct. at 400); *Henderson*,

431 U.S. at 154, 97 S.Ct. at 1737; *Turner v. Calderon,* 281 F.3d 851, 865–66 (9th Cir.2002). An instructional error will violate due process only when there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *See McGuire,* 502 U.S. at 72, 112 S.Ct. at 482. Finally, instructional error in violation of *McGuire* will warrant federal habeas relief only where the erroneous instructions had a substantial and injurious effect on the verdict. *See Brecht v. Abrahamson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993).

## C. *Analysis.*

### 1. Limiting Instruction.

In pretrial proceedings, the trial court ruled that statements made by petitioner to his girlfriend's mother, Colleen Backus ("Backus"), concerning his racial and ethnic animus were admissible to show intent and motive. (*See* RT at 357–60). Van Holt, the gang expert, testified that in forming his opinions he relied, among other things, upon extrajudicial statements made by petitioner to Backus that he disliked "Mexicans, Blacks [and] Jews and that they didn't belong in the country." (*Id.* at 397). Petitioner's counsel did not contemporaneously object to the hearsay testimony. (*See, generally, id.*). Nor did counsel object to the trial court's decision to *sua sponte* instruct the jury with Special Instruction No. 6.50A, regarding the use of gang evidence:

> Evidence has been introduced for the purpose of showing gang membership and association and information on the gang culture.

> Such evidence, if believed, was not received and may not be considered by you to prove [petitioner] is a person of bad character or that he has a disposition to commit crimes.

Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] 1. The existence of the specific intent and knowledge which are necessary elements of the gang crime and enhancement charged, [¶] 2. A motive for the commission of the crimes charged, [¶] 3. Its effect, if any, on a witness'[s] testimony. [¶] 4. The basis for an expert's opinion.

> For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

> You are not permitted to consider such evidence for any other purpose. (CT at 397).

However, on appeal, petitioner argued that "the attempted murder conviction must be reversed because [Special Instruction No. 6.50A] failed to prohibit the jury from considering hearsay of [petitioner's] hatred of others as proof of intent to kill." (Lodgment No. 8 at 16; *accord* Petition at 5). While acknowledging that "the trial court has no duty to sua sponte instruct the jury on the limited admissibility of evidence, since the trial court drafted [Special Instruction No. 6.50A] on the limited scope of the gang expert's testimony, and provided it to the jury sua sponte, the court was required to do so accurately." (Lodgment No. 8 at 16–17). Petitioner's contentions are unpersuasive.

First, as a preliminary matter, by failing to contemporaneously object to Special Instruction 6.50A or suggest his own limiting instruction, petitioner appears to have waived the issue. *See People v. Montiel,* 5 Cal.4th 877, 928 n. 23, 21 Cal.Rptr.2d 705, 855 P.2d 1277 (1993), *cert. denied,* 512 U.S. 1253, 114 S.Ct. 2782, 129 L.Ed.2d 894 (1994) (defendant "cannot claim that limiting instructions were wrongly *omitted* unless his proffer of such instructions was

rejected[ ]") (italics in original); *People v. Bell,* 49 Cal.3d 502, 550, 262 Cal.Rptr. 1, 778 P.2d 129 (1989), *cert. denied,* 495 U.S. 963, 110 S.Ct. 2576, 109 L.Ed.2d 757 (1990) (if defendant "believed that the instruction was incomplete or needed elaboration, it was his responsibility to request an additional or clarifying instruction[ ]"). Second, even assuming the limiting instruction issue had not been waived, petitioner has not satisfied his especially heavy burden to establish prejudice. If petitioner had made a timely objection to the limiting instruction relating to Van Holt's hearsay testimony, the prosecutor could have called Backus to testify regarding petitioner's statements of racial and ethnic hatred. (*See* RT at 357–60) (pretrial ruling that statements made by petitioner to Backus concerning his racial and ethnic animus were admissible to show his intent and motive).

Further, even assuming that Backus's statement had not been admitted through Van Holt's testimony, other evidence indicated that petitioner harbored hatred toward racial and ethnic minorities. Petitioner's statements of racial and ethnic animus to Backus were synonymous with the philosophies of white supremacy advocated by PEN1, of which petitioner stipulated that he was, and has been, a member. (*See* CT at 396; RT at 55–56, 476 & 481). The jury also received other evidence of premeditation. Petitioner initiated the traffic altercation with the victim and then approached him with a deadly weapon hidden behind his thigh. (*See* RT at 155 & 165–66). Petitioner then slashed the victim's throat in what could have been a deadly blow. (*See id.* at 166–67 & 201–10).

Finally, even assuming the trial court should have included a pinpoint instruction limiting the jury's consideration of the hearsay statement Van Holt incorporated into his expert testimony, petitioner has not demonstrated any prejudice. Instructions which limited the impact of the gang expert's testimony were given to the jury. For example, the jury was instructed, pursuant to CALJIC No. 2.80, that "[i]n determining what weight to give to any opinion expressed by an expert witness, you should consider the ... facts or materials upon which each opinion is based, and the reasons for each opinion.... If you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based. [¶] You are not bound by an opinion. Give each opinion the weight you find it deserves." (CT at 381). Further, Special Instruction No. 6.50A informed the jury that the gang expert's testimony "may not be considered by you to prove [petitioner] is a person of bad character or that he has a disposition to commit crimes." (*Id.* at 397). In sum, petitioner has failed to meet his especially heavy burden of showing that the trial court's choice of jury instructions "by itself so infected the entire trial that the resulting conviction violates due process." *McGuire,* 502 U.S. at 72, 112 S.Ct. at 482 (internal quotation marks and citation omitted); *Henderson,* 431 U.S. at 154, 97 S.Ct. at 1737 (same); *Cupp,* 414 U.S. at 147, 94 S.Ct. at 400 (same); *Turner,* 281 F.3d at 865–66 (same); *Murtishaw,* 255 F.3d at 971 (same). Accordingly, Ground Five should be denied.

## 2. Ineffective Assistance of Counsel.

 To establish a prima facie claim of ineffective assistance of counsel, petitioner must demonstrate that his trial counsel's performance fell below an objective standard of reasonableness and that such deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674

(1984); *Williams,* 529 U.S. at 390, 120 S.Ct. at 1511; *Frierson v. Woodford,* 463 F.3d 982, 988 (9th Cir.2006); *Anderson v. Calderon,* 232 F.3d 1053, 1084 (9th Cir. 2000), *cert. denied,* 534 U.S. 1036, 122 S.Ct. 580, 151 L.Ed.2d 451 (2001), and *overruled on other grounds by Osband v. Woodford,* 290 F.3d 1036, 1043 (9th Cir.2002). Therefore, the reviewing court must reject a claim of ineffective assistance upon finding *either* that the defense counsel's performance was reasonable or that the alleged error was not prejudicial.[10] *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069; *Anderson,* 232 F.3d at 1084.

In Ground Six, petitioner contends that his trial counsel was ineffective in failing to (1) request a limiting instruction to prevent the jury from considering Van Holt's hearsay testimony and (2) object to the prosecutor's use of the hearsay in closing argument. (Petition at 6a). Petitioner asserts that "[t]he record sheds no light on why [petitioner's] trial counsel failed to request the court's limiting instruction include language to prevent the jury from considering hearsay underlying the expert's opinion for the truth of the matter asserted, or why there was no objection on grounds of prosecutorial misconduct and request a jury admonition when the prosecutor argued those facts as if they had been established at trial and could be considered for the truth of the matter asserted." (Lodgment No. 8 at 18). Petitioner's contentions are unpersuasive.

First, deference is owed to the tactical decisions made by counsel. *See Hovey v. Ayers,* 458 F.3d 892, 906 (9th Cir.2006); *see also Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (Courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.") (internal quotation marks and citation omitted). Thus, petitioner must overcome the presumption that his trial counsel's actions were the result of sound trial strategy. *See Murtishaw,* 255 F.3d at 939 ("The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy.").

Here, petitioner's counsel likely chose to "ignore" the brief reference to Backus's statement in the prosecutor's closing argument, (*see* RT at 607 & 661), to avoid drawing any needless attention to it. Further, counsel may have preferred that the statement come in through the expert rather than having Backus testify, who may have made additional damaging statements. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Finally, the prosecutor's "error" in stating that Backus testified, (*see* RT at 607) ("you heard from [Backus] . . . [petitioner's] hatred of Blacks, Mexicans, and Jews[ ]"), arguably harmed the prosecutor more than petitioner in that the prosecutor may have lost credibility with the jury because the jury knew that Backus had not testified.

Second, a timely objection to Van Holt's reference to Backus's statement may have

---

**10.** The Ninth Circuit has concluded that "[t]he *Strickland* prejudice analysis is complete in itself [and] there is no place for an additional harmless-error review." *Avila v. Galaza,* 297 F.3d 911, 918 n. 7 (9th Cir.2002), *cert. dismissed,* 538 U.S. 919, 123 S.Ct. 1571, 155 L.Ed.2d 308 (2003), (quoting *Jackson v. Calderon,* 211 F.3d 1148, 1154 n. 2 (9th Cir. 2000)).

been futile. An expert may rely on otherwise inadmissible evidence to form his or her opinion. *See* Cal. Evid.Code § 801(b) (an expert's opinion may be "[b]ased on matter ... made known to him at or before the hearing, whether or not admissible[ ]"); *Gardeley*, 14 Cal.4th at 618, 59 Cal.Rptr.2d 356, 927 P.2d 713 ("Expert testimony may also be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions."). Defense counsel's failure to raise a meritless argument or to take a futile action does not constitute ineffective assistance of counsel. *See Rupe v. Wood*, 93 F.3d 1434, 1444–45 (9th Cir.1996), *cert. denied*, 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 894 (1997); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir.1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 860, 88 L.Ed.2d 899 (1986).

Finally, even assuming, *arguendo*, that counsel should have objected to the references to Backus's statement, petitioner has not established prejudice. As discussed above, if counsel had made a timely objection to Van Holt's hearsay testimony, the prosecutor could have called Backus to testify regarding petitioner's statements of racial and ethnic hatred. *See supra* at § IV.C.1. Similarly, the brief reference to Backus's statement in the prosecutor's closing argument could not have affected the jury more than the other admitted evidence of his hatred and racism. *See id.* In sum, given that objections to Van Holt's and the prosecutor's references to Backus's statement may have been overruled and could have unnecessarily drawn attention to the statement, petitioner has not met his heavy burden to overcome the presumption that counsel's decision not to object to the references to Backus's statement was a sound tactical decision.

In sum, petitioner's speculation that either of the above described errors would have resulted in a more favorable outcome, (*see* Lodgment No. 8 at 17–19), is not enough to "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067; *see Gonzalez v. Knowles*, 515 F.3d 1006, 1016 (9th Cir.2008) ("Such speculation is plainly insufficient to establish prejudice."); *Cooks v. Spalding*, 660 F.2d 738, 740 (9th Cir.1981) (*per curiam* ), *cert. denied*, 455 U.S. 1026, 102 S.Ct. 1729, 72 L.Ed.2d 147 (1982) (mere speculation insufficient to establish prejudice). Viewing the record as a whole, petitioner has not met his burden to establish that his counsel's performance was unreasonable and that any alleged errors were prejudicial. *See Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069; *Anderson*, 232 F.3d at 1084. Thus, the court is persuaded that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Ground Six must be denied.

## V. JURY COERCION.

 In Ground Seven, petitioner contends that the trial court coerced the attempted murder verdict by its remarks to the deadlocked jury. (Petition at 6b).

### A. *Relevant Background.*

On the morning of the third day of deliberations, the jury informed the trial court that they had reached a verdict on Counts 2, 3 and 4, but they were still deliberating on Count 1—the attempted murder count—and one of the enhancements to Count 2. (*See* CT at 311, 316 & 328; RT at 673). The jury foreperson indicated that "regarding Count One ..., although we're not quite at an impasse, it appears that we may be heading in that direction." (RT at 673). The jury was advised to "keep deliberating[ and i]f you find that you have just completely reached

an impasse, and there's no hope of reaching verdicts, let us know." (*Id.* at 675).

Later that morning, the jury informed the court that they had reached an agreement on the enhancements to Count 2 but were still deadlocked nine to three on Count 1. (*See* CT at 328; RT at 675 & 677). The trial court polled the jury as to whether they thought that any further deliberations could lead to a verdict on Count 1. (*See* RT at 675–77). Nine of the jurors thought it was "unlikely" but the other three thought it was "possible." (*See id.*). Because Juror No. 2 was unavailable to continue deliberating that afternoon, (*see id.* at 677), the trial court offered the jury some options:

> I can do one of a couple things. If you want to stay this afternoon, I could see about getting an alternate in. If that's not a possibility, I can order you back on Tuesday....
>
> The other thing I can do is declare a mistrial, that is, among the jury. Obviously, that's my last resort if there's some possibility of resolution. A couple people have indicated that there is a possibility further deliberations might resolve the issue.

(*Id.* at 677–78).

After discussing the matter with counsel at sidebar, the trial court again polled the jurors by a show of hands as to "how many think that further deliberations could result in a verdict as to Count One[.]" (RT at 681–82). "Just about everybody[ ]" raised their hands. (*Id.* at 682). The trial court decided to accept the verdicts on Counts 2, 3 and 4, substitute an alternate juror for Juror No. 1,[11] and order deliberations on Count 1 to continue the following Tuesday. (*See id.* at 685). The jury resumed deliberations on Tuesday and reached a verdict

on Count 1 that afternoon. (*See* CT at 450–51).

### B. *The Court of Appeal's Opinion.*

In analyzing Ground Seven, the court of appeal stated:

> After the jury retired to deliberate, and did so for approximately 11 hours, it returned guilty verdicts on all counts except the attempted premeditated murder. At that time, the foreman indicated the jury was divided on the attempted murder, nine to three. The foreman, a doctor, reminded the court he could not serve any longer; he had informed the court at the beginning of the trial that he had to return to his hospital patients after one week. All but one of the jurors stated they thought it "highly unlikely" they could reach a verdict on the attempted murder charge, although two of them indicated they would like to continue deliberations. The one optimistic juror felt that refreshing their minds on the definition of intent would be of assistance. The court then asked for a show of hands as to how many would like to continue to deliberate to reach a verdict, and he noted for the record that "just about everybody" desired further effort. The court then formally accepted the verdicts, excused the doctor from the jury and replaced him with one of the alternate jurors. The court ordered the newly constituted jury to return on the following Tuesday to deliberate anew. A verdict on the attempted murder charge was returned Tuesday afternoon.
>
> [Petitioner] characterizes the court's action as coercing a verdict from a deadlocked jury akin to the instruction found in *Allen v. United States* (1896) 164 U.S.

---

11. During voir dire, Juror No. 1, a doctor, informed the court that he could serve for only a week before needing to return to the hospital to take care of his patients. (*See* Augmentation of Reporter's Transcript at 118; RT at 685).

492 [17 S.Ct. 154, 41 L.Ed. 528] and later disapproved in *People v. Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997].[FN10] Specifically, he derides the court's discussion with the jury, analogizing the court's comments as indicating that a mistrial would necessitate a retrial, thereby placing the jury in the position of reaching a verdict although it was not unanimous in its opinion.

[FN10] [Petitioner] raised this same issue in his motion for new trial before the trial court which denied his motion.

The trial court never said anything about a retrial. All it said was that it had two options available to it: Accept the partial verdict and substitute an alternate juror for the doctor who had to be discharged; or declare a mistrial which was its "last resort if there's some possibility of resolution" by this jury. Some of the jurors felt further deliberations could bear fruit, and only one expressed the opinion that further discussion was absolutely futile.

Code of Civil Procedure section 233[FN11] provides the statutory authority for a trial court to discharge a juror who becomes ill or is unable to perform the duty required of a jury member. Section 1089[FN12] provides the statutory authority for the trial court to replace such a discharged juror with an alternate. These decisions require a showing of good cause. (See *People v. Burgener* (1986) 41 Cal.3d 505, 519–520 [224 Cal. Rptr. 112, 714 P.2d 1251].) And the determination of good cause is to be affirmed on appeal if there is any substantial evidence supporting the decision. (See *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1484 [267 Cal.Rptr. 865].)

[FN11] Code of Civil Procedure section 233 provides, in pertinent part, that "[i]f, before the jury has returned its verdict to the court, a juror becomes sick or, upon other good cause shown to the court, is found to be unable to perform his or her duty, the court may order the juror to be discharged. If any alternate jurors have been selected as provided by law, one of them shall then be designated by the court to take the place of the juror so discharged...." At the time of the *Burgener* opinion, section 1123 encapsulated this statute, but was repealed in 1989, at which time its contents were recodified as Code of Civil Procedure section 233.

[FN12] Section 1089 provides, in pertinent part, that "[i]f at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

Good cause was shown for the substitution of the juror with the alternate, as the doctor had previously informed the court of his absolute need to return to his hospitalized patients in exactly one week. No other doctor was available to replace him for that purpose, and the week had expired. Good cause was shown, and [petitioner] does not dispute this. His sole argument is that the court should have declared a mistrial rather than substitute the alternate on the jury.

Mistrial is legally necessary when "it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140.) Until that determination is made by the trial court, the jury *cannot* be discharged. (§ 1140; *People v. Harris* (2005) 37 Cal.4th 310, 363 [33 Cal.Rptr.3d 509, 118 P.3d 545].) "Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the

court may direct further deliberations upon its reasonable conclusion that such direction would be perceived "'as a means of enabling the jurors to enhance their understanding of the case rather as mere pressure to reach a verdict on the basis of matters already discussed and considered.'" [Citation.]"

In *Harris,* the jury informed the court on *three* occasions that they were unable to reach a verdict. The first time was after deliberating for four hours. The court answered questions submitted by the jury and sent it back for further deliberations. The second incident occurred later that same Friday, but the court asked and learned that several ballots had been taken with various jurors changing their positions. The court then admonished the jury, saying that "each 'were the type of folks who could choose between the penalties,' that each individual juror had assured the court that he or she could vote for the punishment they thought appropriate, whether it be life without the possibility of parole or death, and that if at any time during the trial any juror felt unable to make such a decision, he or she would inform the court. Each juror was polled and indicated he or she could make such a decision. The court instructed the jurors: 'Do not take any of my comments now or at any time in this trial as suggesting how any juror should vote as to penalty on either count.... [¶] ... I am not going to attempt to coerce a verdict out of a jury at all, but what I will do is explore this until I am convinced that there is no reasonable possibility of a unanimous verdict.... [¶] ... Please draw no inferences from anything that I have said or any question that I may have asked about how I believe or feel this case should be resolved or if it should be.'" (*Id.* at p. 364 [33 Cal. Rptr.3d 509, 118 P.3d 545].)

The third occasion arose the next court day, and again the court sent the jury back for further deliberations after learning that further balloting had resulted in further changes in jurors' positions. On appeal after verdict, the defense argued these repeated admonitions to further deliberate constituted "subtle insistence that a verdict [ ] be reached and implicitly required the jurors to move toward unanimity.... [However, in] spite of the jury's assessment that it was 'hopelessly deadlocked,' the record reasonably supports the court's determination that the jurors had not reached an impasse." (*People v. Harris, supra,* 37 Cal.4th at pp. 364–365 [33 Cal.Rptr.3d 509, 118 P.3d 545].)

In contrast to the situation in *Harris,* the jury in *People v. Hinton* (2004) 121 Cal.App.4th 655 [17 Cal.Rptr.3d 437] informed the judge via a note after deliberating for a day that they "'seem[ed] unable to reach agreement.'" (*Id.* at p. 657 [17 Cal.Rptr.3d 437].) At this point, the court admonished the jury that a "'great deal of effort [was made] by both the parties, a great deal of time and preparation, no small amount of time of your own, and everybody else's, heat, light, in the building, and the rental, and dedication of resources to this matter. An inability to come to a conclusion one way or the other, ... means we would not complete the task we all set out to do. [¶] ... If not us, and if not now, when. The short answer to that question, those questions are *another 12 or 15 people. And when is going to be later....* [L]et me share the kinds of things that I think we all want to go on in deliberations, and then I would appreciate you all telling me if we got this done if that's what we all did, or if somehow we didn't. So let me share this.' The judge read instructions concerning the appropriate conduct of the

jury in deliberations. [¶] [The court then said that] 'the jurors should listen with proper deference to each other and should question their own judgment if a majority of the jurors take a different view of the case. [¶] The jurors should not, however, surrender their own convictions of the truth and weight of the evidence. Each juror must decide the case for himself or herself and not merely acquiesce to the conclusion of others.' " (Id. at pp. 657–658 [17 Cal. Rptr.3d 437], emphasis added.) After this forceful demand, the court then inquired of the jury foreman, who responded that they had all fairly deliberated but that they " 'simply reached a respectful difference of opinion.' " (Id. at p. 658 [17 Cal.Rptr.3d 437].) The court—erroneously—sent the jury for further deliberation based on another juror's comment that further discussion might be helpful.

Contrasting the factual situations in Harris, Hinton and the case before us, it is clear the Harris case is far more akin factually to our case than is Hinton. As was noted in People v. Gainer, supra, 19 Cal.3d at page 852 [139 Cal. Rptr. 861, 566 P.2d 997], it "is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them or (2) states or implies that if the jury fails to agree the case will necessarily be retried.' [Citation.]" The Hinton court violated both those strictures, whereas neither the court in Harris nor the trial court below stepped across the Gainer opinion's boundaries. Thus, no error occurred.

(Opinion at 17–21).

C. *Applicable Federal Law.*

 "[T]he floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Bracy v. Gramley, 520 U.S. 899, 904–05, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97 (1997) (internal citation omitted). The trial judge must "avoid even the appearance of advocacy or partiality." Duckett, 67 F.3d at 739 (internal quotation marks and citation omitted).

 "Coercive statements from the judge to the jury result in a denial of the defendant's right to a fair trial and an impartial jury." Packer v. Hill, 291 F.3d 569, 578 (9th Cir.), rev'd on other grounds, 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). However, upon learning that the jury is deadlocked, a judge may properly charge the jury to resume deliberations. See Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896) (approving a charge which encouraged the minority jurors to reexamine their views in light of the views expressed by the majority). The propriety of this supplemental "Allen charge" must be judged "in its context and under all the circumstances[.]" Jenkins v. United States, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965) (per curiam); see Jiminez v. Myers, 40 F.3d 976, 980 (9th Cir.1993, as amended Oct. 28, 1994) (per curiam), cert. denied, 513 U.S. 810, 115 S.Ct. 60, 130 L.Ed.2d 18 (1994), and cert. denied, 516 U.S. 813, 116 S.Ct. 63, 133 L.Ed.2d 26 (1995) ("We consider whether the court's actions and statements were coercive in the totality of the circumstances."). In assessing the coerciveness of a supplemental instruction, a court must look to: "(1) the form of the instruction; (2) the period of deliberation following the Allen charge; (3) the total time of jury deliberations; and (4) the indicia of coerciveness or pressure upon the jury." United States v. Foster, 711 F.2d 871, 884 (9th Cir.1983, as

*amended* Dec. 13, 1983) (*en banc*) (italics in original).

### D. *Analysis.*

Petitioner contends that "[t]he trial court's order for the jury to continue deliberating because declaring a mistrial among the jury was the trial court's option of last resort, implied that if the jury failed to agree the case will necessarily be retried." (Lodgment No. 8 at 24).

After reviewing the totality of the circumstances, the court finds petitioner's contentions unpersuasive. First, the trial court did not suggest to the jury that if they did not reach a verdict, a retrial would be necessary. Instead, the court merely stated the obvious: if the jury continued to be deadlocked on Count 1, the trial court would have to declare a mistrial on that Count. (*See* RT at 678) ("The other thing I can do is declare a mistrial, that is, among the jury. Obviously, that's my last resort if there's some possibility of resolution."). When a jury appears to be deadlocked, the trial judge, who is in the best position to determine the likelihood of a verdict, has discretion to send the jury back for further deliberation or to declare a mistrial. *See United States v. Sommerstedt*, 752 F.2d 1494, 1497–98 (9th Cir.), *amended by* 760 F.2d 999 (9th Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 149, 88 L.Ed.2d 123 (1985) ("A jury's statement that it currently is deadlocked is, by itself, an insufficient ground for declaring a mistrial.").

Second, following the supplemental charge, the jury did not immediately return a verdict. *See United States v. Bonam*, 772 F.2d 1449, 1451 (1985) (*per curiam*) ("A jury verdict reached immediately after an *Allen* charge can be an indication of coercion.") (italics in original); *accord Levinston v. Terhune*, 2006 WL 2583676, at *10 (N.D.Cal.2006) ("If the jury had immediately returned a verdict after the *Allen* charge, a suspicion of coercion might be raised.") (italics in original). The jury deliberated about 12 hours prior to receiving the court's supplemental charge. (*See* RT at 680). Thereafter, they deliberated an additional five hours before reaching a verdict on Count 1. (*See* CT at 450). Under the circumstances, the jury's deliberation time of five hours after the supplemental charge, (*see id.*), does not indicate that the jury was coerced into returning its verdict. *See United States v. Lorenzo*, 43 F.3d 1303, 1307 & n. 3 (9th Cir.1995) (finding no coercion where verdict reached five and one-half hours after supplemental charge); *Bonam*, 772 F.2d at 1451 (jury deliberation of one and one-half hours between supplemental charge and verdict did not demonstrate coercion); *cf. Weaver v. Thompson*, 197 F.3d 359, 366 (9th Cir.1999) (finding coercion where jury returned verdict five minutes after receiving supplemental charge).

Finally, there is no other indicia of coercion in this case. The trial court's supplemental instruction was not targeted to a specific juror or set of jurors, but was addressed to the entire jury. (*See* RT at 677–78). Further, the trial court did not know which of the jurors were in favor of a particular outcome or whether the majority was in favor of conviction or acquittal. (*See id.* at 677) ("Mr. Foreperson, without telling me which number is for guilt and which number is for not guilty, if you could tell me the numerical split of your last vote[ ]"); *see also United States v. Berger*, 473 F.3d 1080, 1093 (9th Cir.2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 874, 169 L.Ed.2d 725 (2008) (finding no other indicia of coercion where "the judge did not even know whether the majority position was to convict or acquit[ ]") (internal quotation marks and citation omitted).

**1144**

Under the circumstances, and looking at the record as a whole, the court concludes that the trial court's supplemental instruction did not coerce the jury to convict petitioner on Count 1 or otherwise render his trial unfair. Thus, the court is persuaded that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Ground Seven must be denied.

**This Report and Recommendation is not intended for publication. Nor is it intended to be included or submitted to any online service such as Westlaw or Lexis.**

### RECOMMENDATION

Based on the foregoing, IT IS RECOMMENDED that the Court issue an Order:

(1) Accepting and adopting this Report and Recommendation; and

(2) Directing that Judgment be entered dismissing this action with prejudice.

Dated this 28th day April, 2009.